**Exhibit A**



IN THE

# Indiana Supreme Court

Supreme Court Case No. 23S-CT-306



FILED
Dec 23 2024, 4:04 pm
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

Indiana Department of Insurance and Indiana
Patient's Compensation Fund,

*Appellants*

–v–



Jane Doe and John Doe I, individually and as next
friends and legal guardians of John Doe II, and
Jonathon Cavins and Board of Trustees of
Anonymous Hospital,

*Appellees*

---

Argued: January 18, 2024 | Decided: December 23, 2024

Appeal from the Boone Circuit Court
No. 06C01-2108-CT-1016
The Honorable Lori N. Schein, Judge

On Petition to Transfer from the Indiana Court of Appeals
No. 22A-CT-1276

---

**Opinion by Chief Justice Rush**

Justice Goff concurs.
Justice Molter concurs with separate opinion.
Justice Massa concurs in part and dissents in part with separate opinion in
which Justice Slaughter joins.

**Rush, Chief Justice.**

Indiana's Medical Malpractice Act (MMA) limits the damages for which a health care provider can be liable to a patient. When a provider settles a patient's claim by agreeing to pay the maximum amount, the patient may seek excess compensation from the Indiana Patient's Compensation Fund. But such compensation is available only if the health care provider's liability stemmed from an act of malpractice as defined in the MMA.

Here, a physician sexually assaulted a twelve-year-old boy during a medical examination that required touching the child's genitals. The child and his parents filed a medical malpractice complaint, which included a negligent-credentialing claim against the hospital that employed the physician. After the parties settled the underlying case with the hospital, the child and his parents sought excess compensation from the Fund. The defendants pursued summary judgment, claiming excess compensation was unavailable because neither the sexual assault nor the hospital's negligence were acts that fell within the MMA. The trial court denied that motion.

We affirm. In doing so, we resolve three issues of first impression. The Fund can challenge whether a claim falls within the MMA after a plaintiff concludes a settlement with a health care provider. A negligent-credentialing claim falls within the MMA only if the credentialed physician commits an act of medical malpractice. And finally, claims premised on sexual assault by a physician during an authorized medical examination can fall within the MMA if the alleged misconduct stems from an inseparable part of the health care being rendered. Because the designated evidence here establishes that the physician's sexual misconduct fits within this narrow category, the defendants have failed to show that they are entitled to judgment as a matter of law.

## Facts and Procedural History

In February 2019, twelve-year-old John Doe II ("Child") visited Anonymous Hospital to see his longtime pediatrician, Dr. Jonathon

Cavins, for a sports physical.[1] Child arrived at the hospital with his father, mother, brother, and sister, but Child and Dr. Cavins were alone in the examination room during the appointment. Child completed a depression screening, and Dr. Cavins then stepped out of the room while Child took off his clothes and put on a gown for the examination. The examination included Dr. Cavins checking Child for a hernia and discharge from his penis, both of which required Dr. Cavins to touch Child's genitals. During the examination, Dr. Cavins asked Child about sexual activity, and they discussed "things that could happen . . . if you were engaged in sex." Dr. Cavins also asked Child whether he wanted to see a condom. Child declined, but Dr. Cavins took one out anyway and asked Child to feel it. Dr. Cavins then began to stroke Child's penis. Next, he placed the condom on Child's penis and returned to stroking it. Dr. Cavins then explained how to remove and dispose of the condom. The exam ended, and Child returned to his family.

After Child disclosed these events, his parents, John Doe I and Jane Doe, filed a medical malpractice action with the Indiana Department of Insurance (DOI) against Dr. Cavins as well as his employer, Anonymous Hospital, and its Board of Trustees. The complaint alleged that Dr. Cavins "engaged in inappropriate sexual conduct" with Child and included a claim against Anonymous Hospital and the Board of Trustees for negligently credentialing Dr. Cavins. About two years later, the Does and the Board of Trustees ("Hospital") reached a confidential settlement agreement in which the Hospital agreed to pay a total of $400,000—its maximum liability for damages under the MMA. *See* Ind. Code § 34-18-14-3(b)(2). The agreement explained that it entitled the Does to seek excess compensation from the Indiana Patient's Compensation Fund. But it also specified that if the Fund "successfully reject[ed]" the agreement, then it would "be null and void."

---

[1] Though Cavins's medical license has been revoked, we refer to him as "Dr. Cavins" because he was a licensed physician at the time.

Following the settlement, the Does petitioned for excess compensation from the Fund, and both Dr. Cavins and the Hospital intervened. The Does alleged that Child had "suffered from a sexual assault by" Dr. Cavins "during a routine physical examination that occurred" while Dr. Cavins was "providing medical care to" Child. After answering the petition, the DOI and the Fund (collectively "Defendants") moved for summary judgment, arguing that the Does' claims fell outside the MMA because "sexual conduct cannot constitute a rendition of health care." The Does and the Hospital responded with several arguments: (1) the doctrines of laches and equitable estoppel barred the Defendants from challenging the Does' petition; (2) the Does could access excess compensation because the settlement established, as a matter of law, the Hospital's liability for negligent credentialing; (3) the negligent-credentialing claim fell within the MMA; and (4) Dr. Cavins's sexual misconduct fell within the MMA. After a hearing, the trial court summarily denied the Defendants' motion.

On interlocutory appeal, a divided panel of our Court of Appeals reversed in a published opinion, concluding the Defendants were entitled to summary judgment. *Ind. Dep't of Ins. v. Doe*, 211 N.E.3d 1014, 1025 (Ind. Ct. App. 2023). The majority held that (1) the Defendants' challenge was not barred by laches or equitable estoppel, (2) the Defendants could challenge the MMA's applicability post-settlement, (3) the Does' negligent-credentialing claim had to be premised on an underlying act of medical malpractice by a credentialed physician to fall within the MMA, and (4) Dr. Cavins's sexual misconduct did not constitute medical malpractice. *Id.* at 1018, 1021. Judge Robb agreed with the first two holdings but dissented on the last two, concluding that a negligent-credentialing claim need not rest on underlying medical malpractice and that Dr. Cavins's sexual misconduct did, in any case, constitute such malpractice. *Id.* at 1040 (Robb, J., dissenting).

The Does and the Hospital petitioned for transfer, which we granted, vacating the Court of Appeals' opinion. *See* Ind. Appellate Rule 58(A).[2]

## Standards of Review

Summary judgment is appropriate only "if the designated evidentiary matter shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Ind. Trial Rule 56(C). Our review is de novo, drawing all reasonable inferences from the evidence in the non-movant's favor. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). We likewise interpret the MMA de novo. *Cmty. Health Network, Inc. v. McKenzie*, 185 N.E.3d 368, 375 (Ind. 2022).

## Discussion and Decision

The MMA establishes the statutory framework for medical malpractice actions in Indiana. *See* I.C. §§ 34-18-0.5-1 to -18-2. Essential to this framework are several defined terms. "Malpractice" is "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." *Id.* § -2-18. "Health care" is defined as "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § -13. And a "health care provider" may be a licensed "physician" or "hospital." *Id.* § -14(1). Such a provider becomes "qualified" by "complying with the procedures set forth" in Chapter 34-18-3. *Id.* § -24.5.

If a plaintiff files a complaint with claims that fall within the definition of "malpractice," the MMA limits the damages qualified health care providers are required to pay. *Id.* § -14-3(b). And if, as here, a qualified

---

[2] We summarily affirm Sections III and IV of the Court of Appeals' opinion. *See* App. R. 58(A)(2).

health care provider "has agreed to settle its liability on a claim" for the maximum amount, the plaintiff can petition for additional compensation from the Fund by following statutory procedures. *Id.* § -15-3. At a hearing on such a petition, "the court shall consider the liability of the health care provider as admitted and established." *Id.* § -3(5).

Resolving this case hinges on these statutes. We first address a threshold issue and conclude that contesting the compensability of a claim under the MMA is distinct from contesting a health care provider's liability. The Defendants are therefore permitted, notwithstanding the settlement, to challenge whether the Does' claims fall within the MMA. Then, in addressing that challenge, we conclude that a negligent-credentialing claim falls within the MMA only if both alleged acts—for example, a hospital's credentialing decision and a physician's misconduct—sound in malpractice. To that end, we conclude that claims premised on sexual assault by a physician during an authorized medical examination can fall within the MMA if the alleged misconduct stems from an inseparable part of the health care being rendered. Finally, because the designated evidence confirms that Dr. Cavins's sexual misconduct stemmed from an inseparable part of an otherwise proper medical examination that required touching Child in sensitive areas, we hold that the Defendants have failed to show they are entitled to judgment as a matter of law. As a result, the Defendants are not entitled to summary judgment.

## I. The Fund can challenge the applicability of the MMA to the Does' claims despite their settlement with the Hospital.

The MMA limits the liability of a qualified health care provider and sets forth procedures for obtaining damages in excess of those limits. *Atterholt v. Herbst*, 902 N.E.2d 220, 222 (Ind. 2009), *clarified on reh'g*, 907 N.E.2d 528 (Ind. 2009). Under the relevant statutes, a plaintiff may recover excess damages from the Fund by filing a petition and serving it on the DOI, the health care provider, and the provider's insurer. I.C. § 34-18-15-3(1)–(2). A

trial court then holds a hearing on the petition. *Id.* § -3(4). When the court is either "approving a settlement" or "determining the amount, if any," to be paid from the Fund, the court "shall consider the liability of the health care provider as admitted and established." *Id.* § -3(5).

Relying on this statute, the Does and the Hospital argue that the Defendants cannot dispute the negligent-credentialing claim because the settlement agreement "established" the Hospital's liability. In response, the Defendants insist they can contest whether the Does' claims fall within the MMA because that is a separate issue from the Hospital's liability. We agree with the Defendants. Even when a health care provider's liability is "established," the Fund is responsible for providing excess compensation only for claims that fall within the MMA—an issue that can't be decided by a settlement agreement alone.

Under the plain language of Section 34-18-15-3(5), a claim for excess compensation is not "established" by a settlement between a patient and a health care provider; such an agreement only establishes the "liability of the health care provider." *Id.* The distinction between the health care provider's liability and the Fund's liability is critical. The latter involves questions distinct from the former because, while a health care provider may settle a claim of any nature, the Fund is "not required to pay non-compensable damages." *Robertson v. B.O.*, 977 N.E.2d 341, 348 (Ind. 2012) (quotation omitted). Indeed, the Fund is liable only for "a medical malpractice judgment or settlement." *Tucker v. Harrison*, 973 N.E.2d 46, 54 (Ind. Ct. App. 2012), *trans. denied*.

And so, even when a health care provider's settlement resolves the "*factual* question of compensability," the "*legal* question of compensability" from the Fund may remain. *Robertson*, 977 N.E.2d at 347. Factual questions, including whether the patient suffered an injury and what caused it, are "foreclosed" when a health care provider settles. *Id.* at 347–48. But legal questions are not, including whether the "injury is one for which the law recognizes a cause of action" and "which theory of recovery" applies. *Id*. For these reasons, we agree with the decisions from other courts that have all held the Fund, following a settlement, can litigate whether a health care provider's liability is legally compensable

under the MMA. *See, e.g., Cutchin v. Ind. Dep't of Ins.*, 446 F. Supp. 3d 413, 420–21 (S.D. Ind. 2020), *rev'd on other grounds sub nom. Cutchin v. Beard*, 854 F. App'x 86 (7th Cir. 2021); *Dillon v. Callaway*, 609 N.E.2d 424, 426 (Ind. Ct. App. 1993), *trans. denied*; *Plummer v. Beard*, 209 N.E.3d 1184, 1193–96 (Ind. Ct. App. 2023), *trans. denied*.

Here, the issue the Defendants raise is one of legal compensability: whether the Hospital's liability sounds in medical malpractice or in ordinary negligence. The fact that the Hospital's liability is "established" doesn't necessarily mean it is liable for claims of malpractice under the MMA. And only such claims trigger the Fund's duty to pay excess damages. As a result, the Fund can contest the MMA's applicability to a claim after a settlement between a patient and a health care provider. To conclude otherwise would permit parties to unilaterally determine the scope of the MMA regardless of the underlying facts or allegations.

Thus, the Defendants are entitled to challenge whether the Does' claims fall under the MMA. We next consider whether the Defendants are entitled to summary judgment on those claims.

## II. Because Dr. Cavins committed an act of medical malpractice, the Does' claims fall within the MMA.

Having determined that the Fund can challenge whether a health care provider's underlying misconduct is legally compensable, we now address the two remaining issues. The first issue is whether the MMA permits a standalone negligent-credentialing claim. We conclude that it does not. For a secondary claim of liability such as negligent credentialing to fall within the MMA, the credentialing hospital and the physician must each commit an alleged act of medical malpractice. The second, related issue is whether a claim premised on sexual assault by a physician during a medical examination can fall within the MMA. We conclude that it can in narrow circumstances. A patient's claim of sexual assault by a physician during an authorized medical examination can constitute malpractice if the alleged misconduct stems from an inseparable part of the health care

being rendered. And, on this record, we hold that Dr. Cavins's sexual assault constituted malpractice. We address each issue in turn.

## a. To constitute medical malpractice, negligent credentialing must rest on an underlying act of malpractice by the credentialed physician.

The parties dispute whether a negligent-credentialing claim can fall within the MMA without an underlying act of medical malpractice by the credentialed physician. The Does argue that "a hospital credentialing board's act of protecting a patient from a sexual assault that occurs during a medical procedure" alone constitutes malpractice because credentialing "relies upon medical expertise." The Hospital similarly contends that negligent credentialing sounds in medical malpractice regardless of whether the credentialed physician commits malpractice. But the Defendants disagree, insisting that "the underlying act must fall within the scope of the MMA in order for a negligent credentialing claim to also fall within the MMA's scope." We agree with the Defendants. Without an underlying act of malpractice by a credentialed physician, a negligent-credentialing claim lacks the requisite connection to health care.

In enacting the MMA, our Legislature "intended that all actions the underlying basis for which is alleged medical malpractice" be "subject to the act." *Sue Yee Lee v. Lafayette Home Hosp., Inc.*, 410 N.E.2d 1319, 1324 (Ind. Ct. App. 1980). Our test for determining whether a claim falls within the MMA derives from statutory text. As noted previously, the MMA applies to torts "based on health care," I.C. § 34-18-2-18, and "health care" includes acts that were either performed or should have been performed by a health care provider on a patient's behalf during their "medical care, treatment, or confinement," *id.* § -13. We have interpreted "health care" as encompassing the "curative or salutary conduct of a health care provider acting within his or her professional capacity," but not conduct "unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment." *Howard Reg'l Health Sys. v.*

*Gordon*, 952 N.E.2d 182, 185 (Ind. 2011) (quotations omitted). And so, there must be "a causal connection between the conduct complained of and the nature of the patient-health care provider relationship." *Metz ex rel. Metz v. Saint Joseph Reg'l Med. Ctr.-Plymouth Campus, Inc.*, 115 N.E.3d 489, 495 (Ind. Ct. App. 2018) (quotation omitted).

This causal connection must be present for a negligent-credentialing claim to fall within the MMA. To succeed on such a claim, "the plaintiff must show that the physician to whom the hospital allegedly negligently extended privileges breached the applicable standard of care in treating the plaintiff and proximately caused her injuries." *Martinez v. Park*, 959 N.E.2d 259, 271 (Ind. Ct. App. 2011). Because of the causation element, our Court of Appeals has recognized that "it is inappropriate to look only to the credentialing conduct alleged in the complaint." *Winona Mem'l Hosp., Ltd. P'ship v. Kuester*, 737 N.E.2d 824, 828 (Ind. Ct. App. 2000). Rather, the "credentialing process alleged must have resulted in a definable act of medical malpractice that proximately caused injury." *Id.* Otherwise, a negligent-credentialing claim would be "completely unmoored" from the provision of health care. *Fairbanks Hosp. v. Harrold*, 895 N.E.2d 732, 738 (Ind. Ct. App. 2008), *trans. denied*. We agree and conclude that the MMA allows a negligent-credentialing claim only if the physician's underlying conduct constitutes malpractice.

At the same time, we recognize that the credentialing of physicians calls for the professional expertise, skill, and judgment of a hospital's credentialing committee. By statute, a hospital must assign privileges "with the advice and recommendations of the medical staff." I.C. § 16-21-2-5(a)(2). And an administrative regulation requires that physicians be involved in examining hospital health care providers' credentials. 410 Ind. Admin. Code 15-1.5-5(a)(2). We do not doubt that credentialing is integral to health care, but not every act of misconduct by a credentialed physician is necessarily tied to health care. *See, e.g., Terry v. Cmty. Health Network, Inc.*, 17 N.E.3d 389, 395 (Ind. Ct. App. 2014) (distressing remarks of emergency-room staff were unrelated to the plaintiff's care); *G.F. v. St. Catherine Hosp., Inc.*, 124 N.E.3d 76, 88 (Ind. Ct. App. 2019) (a physician's disclosure of confidential medical information was not health care), *trans. denied*. And so, when a patient claims only that a hospital negligently

credentialed a physician, and thereby exposed the patient to the risk of the physician's non-care-related misconduct, the requisite connection between the complained-of conduct and the patient-provider relationship is missing.

For these reasons, a claim of secondary liability—such as one for negligent credentialing—falls under the MMA only if both alleged acts constitute malpractice. We now turn to whether the Does' claims, each of which stems from Dr. Cavins's sexual assault, fall within the MMA.

### b. Dr. Cavins's sexual assault stemmed from an inseparable part of the health care he rendered to Child during an authorized medical examination.

Finally, the parties dispute whether a claim based on sexual misconduct by a physician can fall within the MMA and whether the Does' claims do so here. The Defendants argue that Dr. Cavins's sexual assault fell "so far outside the scope of medicine" that it couldn't possibly relate to health care. The Does, however, assert that Dr. Cavins "was authorized to touch" Child "by way of a hernia and discharge test" and the assault "arose out of this authorized conduct." The Hospital similarly contends that Dr. Cavins's actions were "sufficiently intertwined with legitimate medical care such that the claims against him fell within the purview of the MMA." We ultimately agree with the Does and the Hospital.

Based on the MMA's statutory definitions and relevant caselaw, we conclude that a patient's claim of sexual assault by a physician during an authorized medical examination can constitute malpractice if the alleged misconduct stems from an inseparable part of the health care being rendered. And, on this record, because the designated evidence shows Dr. Cavins's misconduct stemmed from an inseparable part of the health care he rendered, the Defendants have failed to show they are entitled to judgment as a matter of law.

### i. Statutory definitions and relevant caselaw establish that a claim based on sexual assault by a physician during a medical examination can fall within the MMA.

A provider can commit malpractice in the form of a tort, which the MMA defines as "a legal wrong, breach of duty, or negligent or unlawful act or omission proximately causing injury or damage to another." I.C. § 34-18-2-28.[3] A sexual assault falls within this definition, as a victim can maintain a civil action for damages through a tort suit for battery. *Lessley v. City of Madison*, 654 F. Supp. 2d 877, 913–14 (S.D. Ind. 2009); 24 Ind. Law Encyc. Rape § 34 (2024). For such a battery to constitute malpractice, it must be "based on health care," I.C. § 34-18-2-18. And, as noted above, "health care" is a defined term. *Id.* § -13.

From these relevant definitions, it follows that sexual assault is a "tort" constituting "malpractice" if it is based on "an act or treatment performed or furnished . . . by a health care provider for, to, or on behalf of a patient" during their "medical care, treatment, or confinement." *Id.*; *see also Popovich v. Danielson*, 896 N.E.2d 1196, 1202 (Ind. Ct. App. 2008) (holding that a physician's battery of a patient "while he was evaluating [her] injuries" fell within the MMA), *trans. denied.* Thus, the statutory text alone confirms that a patient's claim of sexual assault by a physician during a medical examination can fall within the MMA.

This conclusion, however, is bolstered by caselaw interpreting and applying the MMA as well as by decisions from other states. The MMA covers the "curative or salutary conduct of a health care provider acting within his or her professional capacity." *Gordon*, 952 N.E.2d at 185 (quotation omitted). We "look to the substance of the claim and determine

---

[3] Unlike other states, Indiana does not have a statutory prohibition on malpractice actions premised on intentional torts. *Cf.* Ariz. Rev. Stat. Ann. § 12-562(B) (2009); La. Stat. Ann. § 40:1231.1(13) (2020).

whether it is based on the provider's behavior or practices while acting in his or her professional capacity as a provider of medical services." *Doe v. Ind. Dep't of Ins.*, 194 N.E.3d 1197, 1200 (Ind. Ct. App. 2022), *trans. denied*. Ultimately, as mentioned earlier, a claim falls within the MMA when "there is a causal connection between the conduct complained of and the nature of the patient-health care provider relationship." *Metz*, 115 N.E.3d at 495 (quotation omitted). But this requisite connection is absent when a health care provider's conduct is "demonstrably unrelated to the promotion of the plaintiff's health or an exercise of the provider's professional expertise, skill, or judgment." *Gordon*, 952 N.E.2d at 186.

Claims premised on a physician sexually assaulting a patient will often fall within the "demonstrably unrelated" category due to the lack of a causal connection between the misconduct and the patient-provider relationship. But often is not always. *See Terry*, 17 N.E.3d at 393 ("Our courts have held the Act applied to a variety of claims that do not look like traditional medical malpractice."). Indeed, our Court of Appeals has held that the MMA applied to claims based on a provider's failure to properly monitor patients that resulted in sexual assault, *Anonymous Hosp., Inc. v. Doe*, 996 N.E.2d 329, 335–36 (Ind. Ct. App. 2013), *trans. denied*, and sexual activity between two vulnerable patients, *Willingham v. Anderson Ctr.*, 216 N.E.3d 517, 522–23 (Ind. Ct. App. 2023). Though neither case involved a physician sexually assaulting a patient, they illustrate that not all claims premised on sexual conduct are "demonstrably unrelated" to health care.

The requisite connection is more likely to be present when, as here, a physician sexually assaults a patient during an authorized medical examination that calls for touching the patient in sensitive areas. In these circumstances, other states have concluded that the sexual misconduct can be an "inseparable part of the health care being rendered." *Hagan v. Antonio*, 397 S.E.2d 810, 812 (Va. 1990). For example, the Virginia Supreme Court— applying nearly identical definitions of "malpractice," "health care," and "tort"—has held that a physician's alleged sexual assault of a patient during a breast examination constituted malpractice. *Id.* at 811–12. The South Dakota Supreme Court has similarly held that improper sexual contact during a pelvic examination constituted malpractice. *Martinmaas v. Engelmann*, 612 N.W.2d 600, 603, 608 (S.D. 2000). The Wisconsin Supreme

Court has likewise recognized that "there are medical reasons for a physician to touch a patient's genitals in the course of a legitimate physical examination." *Doe 56 v. Mayo Clinic Health Sys.–Eau Claire Clinic, Inc.*, 880 N.W.2d 681, 691 n.13 (Wis. 2016). And Hawaii's Intermediate Court of Appeals has concluded that a doctor's finger penetrating a patient's vagina or anus during a physical examination "can be a sexual assault that is classified as an inseparable part of examination or treatment." *Doe v. City & Cnty. of Honolulu*, 6 P.3d 362, 373 (Haw. Ct. App. 2000) (quotations omitted). These decisions reflect the reality that not all allegations of sexual assault against physicians are alike.

The Defendants note there is "no reported Indiana case in which a court has concluded that a claim based upon a physician sexually molesting a child" falls "within the scope" of the MMA. Our dissenting colleagues emphasize the same point. *Post*, at 2. But there is no Indiana case concluding that such a claim falls outside the MMA either; the cases cited by both the Defendants and the dissent do not address this precise issue. In one case, the patient was not a child. *Collins v. Thakkar*, 552 N.E.2d 507, 509 (Ind. Ct. App. 1990), *trans. denied*. And in the other three cases, the assault was not committed by a physician. *Doe by Roe v. Madison Ctr. Hosp.*, 652 N.E.2d 101, 107 (Ind. Ct. App. 1995), *trans. dismissed*; *Murphy v. Mortell*, 684 N.E.2d 1185, 1186 (Ind. Ct. App. 1997), *trans. denied*; *Fairbanks Hosp.*, 895 N.E.2d at 734.

In fact, every reported decision in Indiana involving sexual assault by a health care provider has involved misconduct entirely disconnected from authorized medical care or treatment.[4] *See Collins*, 552 N.E.2d at 509 (doctor, who had a nearly four-year sexual relationship with a patient, used medical instruments "after ordinary office hours" to cause a miscarriage during an examination that was purportedly to determine only "whether

_____

[4] The pending case of *Kansal v. Krieter* may be an exception to this general statement. 213 N.E.3d 573, 575–76 (Ind. Ct. App. 2023). Contemporaneously with our decision in this case, we grant transfer in *Kansal* and remand that case to the trial court for further proceedings consistent with this decision.

she was pregnant");[5] *Doe by Roe*, 652 N.E.2d at 102, 104 (mental health counselor coerced a minor patient admitted for psychiatric treatment to engage in sexual intercourse); *Murphy*, 684 N.E.2d at 1186 (therapy technician molested an unconscious, restrained patient who had been in an automobile accident); *Fairbanks Hosp.*, 895 N.E.2d at 734 (guidance counselor made several unwanted sexual advances toward a patient who was admitted for substance-abuse treatment); *Doe*, 194 N.E.3d at 1198–99 (registered nurse twice sexually assaulted an ICU patient who had suffered a stroke). The misconduct in each of these cases lacked a "causal connection" to the "patient-health care provider relationship," *Metz*, 115 N.E.3d at 495 (quotation omitted), or to "curative or salutary conduct," *Gordon*, 952 N.E.2d at 185 (quotation omitted), and did not implicate the professional standard of care, which is "the quintessence of a malpractice case," *Van Sice v. Sentany*, 595 N.E.2d 264, 267 (Ind. Ct. App. 1992). Indeed, no case before now involved a sexual assault stemming from an inseparable part of the health care being rendered. As such, there has never been—as the dissent contends—a "bright-line rule" placing all sexual assaults categorically outside the MMA. *Post*, at 2.

And when a physician sexually assaults a patient during an authorized medical examination that calls for touching the patient in sensitive areas, the requisite connection to the patient-provider relationship may be present and the applicable standard of care may be implicated. So, recognizing that not all allegations of sexual assault against health care providers are alike, we conclude that claims premised on sexual assault by a physician during an authorized medical examination can fall within the MMA if the alleged misconduct stems from an inseparable part of the

---

[5] The majority in *Collins* concluded that the alleged misconduct, though it occurred "during the rendition of health care," wasn't malpractice because it wasn't "designed to promote the patient's health." 552 N.E.2d at 511. Though we find the facts in *Collins* distinguishable, to the extent it conflicts with the test we set forth today, we disapprove of that opinion.

health care being rendered.[6] We now apply this test to determine whether the Defendants have established that they are entitled to judgment as a matter of law.

## ii. The designated evidence fails to show that Dr. Cavins's sexual misconduct falls outside the MMA.

The substance of the Does' claims and the designated evidence confirm that Dr. Cavins's sexual assault stemmed from an authorized examination that required touching Child in sensitive areas. Indeed, the Does alleged that Child "suffered from a sexual assault" while Dr. Cavins was conducting "a routine physical examination." And the designated evidence reveals that Child was seeing Dr. Cavins on the day of the incident for a physical examination that included a hernia test, which involved Dr. Cavins touching Child's genitals, as well as a discharge test, during which Dr. Cavins ran his fingers down the shaft of Child's penis. Though Child did not know the purpose of these tests, he was not upset by the administration of the hernia test because Dr. Cavins had performed it before. And uncontested expert evidence in the record confirms that a hernia test involves touching the testicles and a discharge test involves touching the penis. It was shortly after the hernia test that Dr. Cavins sexually assaulted Child by stroking his penis and putting a condom on it.

Thus, the sexual assault occurred during an authorized physical examination that included tests requiring Dr. Cavins to touch Child's genitalia. And so, on this record, Dr. Cavins's misconduct was based on his "behavior or practices" while acting in his "professional capacity as a provider of medical services." *Doe*, 194 N.E.3d at 1200.

---

[6] As the concurring opinion explains, there is no reason to categorically distinguish sexual from nonsexual battery for purposes of the MMA. *Post*, at 2. A provider might commit either one under the guise of proper medical care. *Id.* And both may stem from an inseparable part of the health care being rendered. *Id.*

Further uncontested evidence confirms that Dr. Cavins's sexual misconduct stemmed from an inseparable part of the health care being rendered. The Does submitted expert testimony from a doctor who stated that it's common when examining an adolescent male to "use your hands on the testicles and on the penis." That same doctor also specified that the American Academy of Pediatrics deems it acceptable to discuss condoms with children and that he was aware of practices that demonstrated their use. A different doctor added that she had discussed condom use with adolescent patients. To that end, the Does received a physical examination form that presented "things to remind the physician about for this exam," which included condom use. And during the examination, Dr. Cavins pulled out and showed Child the condom when talking to him about sexual activity.

That said, we acknowledge the Defendants designated an affidavit from a physician who provided his "professional opinion that the act of putting a condom on a pediatric patient, such as was described in this case, is not an act of health care and does not constitute the practice of medicine." He reached the same opinion for "stroking a patient's penis." However, an act of misconduct need not itself be an "act of health care" to constitute malpractice, so long as it stems from an inseparable part of the health care being rendered during an authorized medical examination. Accordingly, the Defendants' expert's affidavit does not establish, as a matter of law, that there was no causal connection between the misconduct and the patient-provider relationship.

To summarize, the substance of the Does' claims and the designated evidence establish that this is not a case where the sexual assault was "demonstrably unrelated to the promotion of the plaintiff's health or an exercise of the provider's professional expertise, skill, or judgment." *Gordon*, 952 N.E.2d at 186. Rather, this is a case where a physician sexually assaulted a patient during an authorized medical examination that required the physician to touch the patient in sensitive areas. And, on these narrow facts, that sexual misconduct stemmed from an inseparable part of the health care being rendered. We therefore hold that the Defendants are not entitled to judgment as a matter of law.

## Conclusion

For the reasons articulated above, we affirm the trial court's denial of the Defendants' motion for summary judgment and remand for proceedings consistent with this opinion.

Goff, J., concurs.
Molter, J., concurs with separate opinion.
Massa, J., concurs in part and dissents in part with separate opinion in which Slaughter, J., joins.

ATTORNEYS FOR APPELLANTS INDIANA DEPARTMENT OF
INSURANCE AND INDIANA PATIENT'S COMPENSATION FUND
Wade D. Fulford
Lewis Wagner, LLP
Indianapolis, Indiana

Michael D. Heavilon
DeFur Voran
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES JANE DOE, JOHN DOE I, AND
JOHN DOE II
Gregory L. Laker
Gabriel A. Hawkins
Cohen & Malad, LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE BOARD OF TRUSTEES OF
ANONYMOUS HOSPITAL
Norris Cunningham
Brian L. Park
Michael J. Blinn
Stoll Keenon Ogden PLLC
Indianapolis, Indiana

ATTORNEY FOR APPELLEE JONATHON CAVINS
Michael D. Conner
Spitzer Herriman Stephenson Holderead Conner & Persinger, LLP
Marion, Indiana

**Molter, J., concurring.**

I join Chief Justice Rush's well-reasoned opinion for the Court, and I write separately only to note one more point in response to the partial dissent's concern that we are straying from the Medical Malpractice Act's plain terms: The Court's statutory interpretation mirrors how the Patient's Compensation Fund interprets the Act when applying it to an alleged nonsexual battery during medical treatment; so if the Fund's interpretation in that context is correct, then it follows that the Court doesn't deviate from the statutory text by treating an alleged sexual battery during medical treatment the same.

Consider a recent, infamous example where a nonsexual battery was intertwined with health care. *Weinberger v. Gill*, 983 N.E.2d 1158, 1160 (Ind. Ct. App. 2013); *see also* Charles Wilson, *Nose doctor's ex-patients settle lawsuits for $55M*, Associated Press (June 25, 2013, 4:10 PM), https://apnews.com/general-news-63c90a2a2c394004bedc5f4676c39b08. Gloria Gill sought treatment from Dr. Mark Weinberger for her migraines and congestion, and he recommended surgery. *Weinberger*, 983 N.E.2d at 1159. Gill followed that recommendation, and the surgery "operative report indicated that Weinberger performed nearly every type of procedure within the field of sinus and nose surgery in the single surgery." *Id.*

After many months of considerable pain, Gill saw another doctor who performed a CT scan, which revealed that Dr. Weinberger didn't perform the procedures for which he billed. Instead, "the only procedure Weinberger had performed during Gill's surgery was drilling two unnecessary holes in her sinuses." *Id.* at 1160. The surgery was just a ruse for fraudulent billing, and the unnecessary surgery led to months of "sharp pains shooting through her face and cheekbones." *Id.*

That was just one of many such cases. After the scam was uncovered, nearly 300 patients claimed similar malpractice, reportedly leading to a $55 million settlement. Wilson, *supra.* And Dr. Weinberger went to federal prison for fraud. *Indiana Nose Doctor Gets 7 Years In Medical Fraud Case*, CBS News (Oct. 12, 2012, 3:01 PM), https://www.cbsnews.com/chicago/news/indiana-nose-doctor-gets-7-

years-in-medical-fraud-case/ [https://perma.cc/9BUB-83Z8] (last visited Dec. 23, 2024).

The Fund understands the Act as covering allegations like Gill's, and that seems to be the best reading of the statutory language. The relevant statutory language directs that alleged tortious conduct falls under the Act if the conduct was "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." Ind. Code § 34-18-2-13. Dr. Weinberger's conduct in drilling holes in Gill's sinuses—though having no legitimate medical purpose—was a tortious act "by a health care provider" that occurred "during the patient's medical care, treatment, or confinement." *See id.*

Deceiving a patient into an unnecessary surgery so that the doctor can fraudulently bill the patient is just as much a battery as deceiving a patient to believe that the doctor's molestation is part of a sports physical. *See Mullins v. Parkview Hosp., Inc.*, 865 N.E.2d 608, 610 (Ind. 2007) ("Failure to obtain *informed* consent in the medical context may result in a battery." (emphasis added)); *see generally* Restatement (Second) of Torts § 892B (1979) (explaining that if a patient's consent is induced by fraud, the patient "may maintain an action for battery"). Yet while the Fund agrees Dr. Weinberger's conduct is subject to the Act, it argues Dr. Cavins' is not. As the Fund understands the Act, the distinction is that nonsexual batteries like Dr. Weinberger's remain in the "zone of potential treatment." Oral Argument at 10:15–11:12. But that is just another way of saying, as the Court's opinion does, that the battery "stems from an inseparable part of the health care being rendered." *Ante,* at 11. And as the Court's opinion explains, Dr. Cavins' battery was an inseparable part of the health care he was providing.

Just as Dr. Weinberger's conduct wasn't excluded from the Act simply because it amounted to battery, neither is Dr. Cavins'. Like Dr. Weinberger's battery in furtherance of his nefarious financial motives, Dr. Cavins' battery in furtherance of his nefarious sexual motives was a tortious act "by a health care provider" that occurred "during the patient's medical care, treatment, or confinement." *Id.* Because the relevant

statutory language doesn't distinguish between sexual and nonsexual batteries, we shouldn't either.

As the partial dissent appropriately reminds, we must be just as mindful of what the statute does not say as what it does. *Post*, at 1. By treating all types of battery the same, the Court's opinion remains faithful to the statutory text.

**Massa, J., concurring in part, dissenting in part**

I completely concur in the Court's holding on two of three issues decided; first, that the Fund may challenge whether the Does' claims fall within the MMA, notwithstanding the settlement, and second, that a negligent-credentialing claim falls within the MMA only if both alleged acts sound in malpractice. Where I part company and respectfully dissent is from the holding that child molestation may constitute medical malpractice under the Act. The doctor's actions here occupy the broad realm of ordinary torts not subject to the Act, and not the narrow realm of medical malpractice.

The text of the statute states what the policy implies: the MMA covers only health care. The Act defines "malpractice" as "a tort or breach of contract based on **health care** or **professional services** that were provided, or that should have been provided, by a health care provider, to a patient." Ind. Code § 34-18-2-18 (emphasis added). Here, the dispute hinges on whether the doctor's criminal conduct (and obvious civil battery) of sexual child molestation was "health care or professional services" provided to Child, or health care or professional services "that should have been provided" to him. *Id.* Simply put, it is not.

"Health care" is defined under the Act as "an act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." *Id.* § -13. When presented with a term defined by the legislature, its definition controls and we apply its plain meaning. *WTHR-TV v. Hamilton Se. Schs.*, 178 N.E.3d 1187, 1191 (Ind. 2022). As such, we are mindful of "what the statute does—and does not—say." *Id.* at 1191 (cleaned up). Here, the Act by its terms does not include "sexual assault" in its definition. Nor does it suggest that criminal conduct comes more generally within its sweep. Of course, that makes sense since statutory language best reflects the statute's policy goals. *See Nicoson v. State*, 938 N.E.2d 660, 663 (Ind. 2010). Yet what the text suggests—by omitting the sexual assault and criminal conduct from the definition under the Act—the policy confirms: sexual assault is **not** health care. *See* Otis R. Bowen, *Medical Malpractice Law in Indiana*, 11 J.

LEGIS. 15 (1984) (explaining the legislature passed the Act as a limitation of liability); *Atterholt v. Herbst*, 902 N.E.2d 220, 223 (Ind. 2009).

Indiana courts have long embraced the bright-line rule that sexual assault is not medical malpractice because the MMA encompasses only "curative or salutary conduct of a health care provider acting within his or her professional capacity, but not conduct unrelated to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment." *Howard Reg'l Health Sys. v. Gordon*, 952 N.E.2d 182, 185 (Ind. 2011) (cleaned up). That interpretation had been ironclad until today. There was **no** reported Indiana case in which a court had ever concluded that a claim based on a physician sexually molesting a child fell within the MMA. Every reported case in Indiana to have encountered this issue had ruled that sexual assault is not medical malpractice. *See, e.g., Collins v. Thakkar*, 552 N.E.2d 507, 508 (Ind. Ct. App. 1990) (purposeful use of medical instruments to cause miscarriage of patient with whom physician had sexual relationship was not within MMA); *Murphy v. Mortell*, 684 N.E.2d 1185, 1188 (Ind. Ct. App. 1997) (claims that physician forced patient to engage in intercourse causing her to contract venereal disease "did not constitute a rendition of health care or professional services"); *Doe by Roe v. Madison Ctr. Hosp.*, 652 N.E.2d 101, 104 (Ind. Ct. App. 1995) (allegations of coerced intercourse between a minor patient and a hospital employee fell outside the Act because they "do not describe professional services"); *Fairbanks Hosp. v. Harrold*, 895 N.E.2d 732, 734 (Ind. Ct. App. 2008) (unwanted sexual advances, including hugging and kissing an eight-year-old patient, were not within the Act). Indiana precedent shows that whether misconduct occurs in a healthcare facility or if the injured party is a patient at the facility is not dispositive to whether medical malpractice occurred. *Terry v. Cmty. Health Network, Inc.*, 17 N.E.3d 389, 393 (Ind. Ct. App. 2014).

To sidestep our longstanding categorical rule, the Court today holds that sexual assault can fall within the MMA if it stems from "an inseparable part of the health care being rendered." *Ante*, at 6. This conclusion deviates significantly from the Act's plain text and precedents which have long safeguarded the limits of the MMA. *See Ind. Dep't of Ins. v. Doe*, 211 N.E.3d 1014, 1021 (Ind. Ct. App. 2023).

This textual and precedential understanding of health care is further reinforced by evidence in the record, from Dr. James E. Crawford-Jakubiak, the current medical director at the Center for Child Protection at the University of California – San Fransisco Benioff Children's Hospital, who testified that Cavins's acts were completely unmoored from the standard exercise of medical skill, expertise, or judgment. Nothing about sexually assaulting a minor is medical care under the Act. There is no medical reason for a physician to place a condom on a patient. Nor is there is a medical purpose for a physician to stroke a child's penis during a sports physical examination. In short, these terrible criminal acts were just that: terrible criminal acts. They are "unrelated" to health care and thus outside the MMA. *See Gordon*, 952 N.E.2d at 185.

Most significantly, our decision today ignores the history and purpose of Indiana's groundbreaking MMA passed five decades ago: to limit liability for medical malpractice and to lower insurance costs by capping judgments and spreading the risk of compensating victims of negligence, not willful crimes. Doctors were leaving the field for want of affordable insurance. That's why we have the MMA, not to compensate crime victims or to socialize among all healthcare providers the costs of a criminal's wrongful acts. By its design, the statute places beyond "the legislation's purview conduct of a provider **unrelated** to the promotion of a patient's health or the provider's exercise of professional expertise, skill, or judgment." *Collins*, 552 N.E.2d at 510 (emphasis added).

Finally, the paradoxical alignment of the parties here further explains the need to confine the statute's application to its plain terms. The plaintiffs and the intervening defendants both sought an unprecedented legal determination that molestation is malpractice: the plaintiffs so they could access the fund for excess damages; the intervening defendant hospital and doctor so they could enjoy the protection of the Act's cap on damages. Only the Fund stepped up on behalf of all who pay into it to assert that the Act was not adopted to spread the risk of criminal activity and limit its costs. The Fund's position is correct.

Slaughter, J. joins.