

FILED

Jan 09 2025, 10:30 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Indiana Supreme Court

Supreme Court Case No. 23S-CT-277

## Linda Gierek and Stephen Gierek, on behalf of themselves and all others similarly situated, et al.,

*Appellants (Plaintiffs below)*

–v–

## Anonymous 1, Anonymous 2, and Anonymous 3, et al.

*Appellees (Defendants below)*

and

## Amy L. Beard, Commissioner of the Indiana Department of Insurance as Administrator of the Indiana Patient's Compensation Fund

*Appellee (Intervenor below)*

---

Argued: November 29, 2023 | Decided: January 9, 2025

Appeal from the Elkhart Superior Court,
Nos. 20D02-1911-CT-243, 20D05-2002-CT-25
The Honorable Stephen R. Bowers, Judge

On Petition to Transfer from the Indiana Court of Appeals,
No. 22A-CT-1225

**Opinion by Justice Goff**

Chief Justice Rush concurs.

Justice Massa concurs in the judgment.

Justice Slaughter concurs in the judgment in part and dissents in part with separate opinion in which Justice Molter joins.

**Goff, Justice.**

The Medical Malpractice Act (MMA or Act) generally requires a medical-review panel to first issue an opinion on a claimant's proposed complaint before litigation in a trial court. But while the complaint is pending before the review panel, a claimant may file an action in court for a preliminary determination of certain limited threshold issues. The question here is whether class certification by the trial court is a proper preliminary determination under the MMA. We hold that it is. We also hold, as an initial matter, that the MMA covers **all** claims for medical "malpractice" (as that term is defined) and is **not** limited to claims involving only bodily injury or death.

We thus affirm in part and reverse in part and remand for the trial court to consider the plaintiffs' motion for class certification.

## Facts and Procedural History

In late 2019, the anonymous defendants here (whom we refer to collectively as the Hospital) sent letters to over a thousand of their patients, including Linda Gierek, informing them that they may have been exposed to infectious diseases due to a technician's failure to fully sterilize certain surgical instruments. Gierek filed a class-action complaint against the Hospital in both the trial court and with the Indiana Department of Insurance (or DOI), asserting claims of negligent infliction of emotional distress, negligence, and medical malpractice. Gierek then sought class certification for similarly situated patients and their spouses. The trial court, by joint motion from the parties, consolidated Gierek's action with a separate class-action claim filed by Cheyanne Bennett, who likewise requested class certification. We refer to the plaintiffs collectively as the Patients.

The Indiana Patient's Compensation Fund (or Fund) intervened and moved for partial summary judgment, arguing that, because the Patients' claims sounded in ordinary negligence, the MMA does not apply. Patients filed statements in support of the Fund's motion while the Hospital cross-

moved for partial summary judgment by arguing that the MMA does apply. The trial court first ruled that the MMA applies to the Patients' claims, thus resolving the competing motions for summary judgment in the Hospital's favor. The trial court then denied the Patients' motion for class certification, concluding that it lacked subject-matter jurisdiction to rule on those motions while a proposed complaint was pending before a medical-review panel.

On discretionary interlocutory appeal, the Court of Appeals affirmed in part and reversed in part, holding first that the MMA applies to the Patients' claims because the alleged tortious conduct related to a "surgical procedure"—the "very essence of 'health care' as defined by the MMA." *Gierek v. Anonymous 1*, 212 N.E.3d 208, 215 (Ind. Ct. App. 2023). The panel then held that the trial court erred in its conclusion that it lacked subject-matter jurisdiction to grant, as a preliminary determination, the Patients' motions to certify a class. *Id.* at 216.

The Hospital and the Fund petitioned for transfer, which we granted, thus vacating the Court of Appeals' decision. *See* Ind. Appellate Rule 58(A).

## Standard of Review

As set forth above, the trial court's order disposed of two issues: the applicability of the MMA, raised in the competing motions for summary judgment; and the scope of the court's preliminary-determination jurisdiction under the MMA, raised in the Patients' motions for class certification. We review a summary-judgment ruling under a de novo standard. *Hughley v. State*, 15 N.E.3d 1000, 1003 (Ind. 2014). And though we typically review a class-certification ruling for an abuse of discretion, resolution of this issue turns on the interpretation of the MMA—a legal question subject to de novo review. *Budden v. Bd. of Sch. Comm'rs of City of Indianapolis*, 698 N.E.2d 1157, 1160 (Ind. 1998).

# Discussion and Decision

In resolving this case, our opinion proceeds in two parts: First, we address the scope of the MMA to determine whether it encompasses the Patients' claims. Concluding that it does, we then hold that the trial court had jurisdictional discretion to preliminarily determine class certification.

## I.  The MMA applies to the Patients' emotional-distress claim.

On appeal and in their initial briefings on transfer, the parties disputed the MMA's application based principally on whether the subject matter of this case—the failure to sterilize surgical instruments—is capable of resolution without reference to the relevant standard of care. Appellants' Br. at 26–39; Appellees' (Hosp.) Br. at 26–32. But at oral argument, we questioned the MMA's applicability based on the type of injury the Patients sustained. The Act generally allows "a patient or the representative of a patient who has a claim under [the Act] for **bodily injury or death** on account of malpractice" to file "a complaint in any court of law having requisite jurisdiction" and to "exercise the right to a trial by jury." Ind. Code § 34-18-8-1 (the Complaint Statute or just Statute) (emphasis added). Given the apparent absence of a "bodily injury" here, we asked the parties to file supplemental briefing on the issue.

Patients argue that the "plain meaning" of the Complaint Statute controls. Appellants' Supp. Resp. Br. at 13. The term "bodily injury," they insist, "means physical damage to a person's body and does not extend to

purely emotional harms." Appellants' Supp. Br. at 14.[1] The Hospital rejects this claim, arguing that a "psychological injury is a bodily injury sufficient to trigger the MMA." Appellees' (Hosp.) Supp. Br. at 11. To conclude otherwise, the Hospital submits, would defeat the MMA's broad purpose of protecting healthcare providers from malpractice claims and preserving the availability of healthcare services in our communities. *Id.* at 11, 12.

The Fund, for its part, argues that the General Assembly never intended to limit the MMA to only claims for "bodily injury or death." Appellee's (Fund) Supp. Br. at 6–10. The language of the Complaint Statute, the Fund insists, was "inartfully" drafted and "should not be interpreted to curtail the meaning of statutory 'malpractice.'" *Id.* at 9–10, 13. Amicus curiae, the Indiana Hospital Association (IHA), similarly contends that the MMA applies to **all** claims of "malpractice" brought by "patients" against "qualified providers," as those terms are defined by the Act. Amicus IHA Supp. Br. at 9, 13. Limiting the Act's scope to claims involving "bodily injury or death," the IHA submits, unnecessarily emphasizes a single phrase, placing the Complaint Statute "in conflict with the rest of the statute's scheme." *Id.* at 8.

Our goal when interpreting a statute is to determine the legislature's intent. *Lake Cnty. Bd. of Comm'rs v. State*, 181 N.E.3d 960, 968 (Ind. 2022). To that end, we first consider the plain and ordinary meaning of the statutory text, taking into account "the structure of the statute as a whole." *ESPN, Inc. v. Univ. of Notre Dame Police Dep't*, 62 N.E.3d 1192, 1195 (Ind. 2016).

---

[1] Because the Patients failed to make this specific argument below, the Hospital insists the issue is waived. Appellees' (Hosp.) Supp. Br. at 6. We disagree. Even if waiver could expand the jurisdiction of a medical review panel, our request for supplemental briefing on this issue amounted to unequivocal notice, and the parties responded by presenting their respective arguments. *See Solarize Ind., Inc. v. S. Ind. Gas & Elec. Co.*, 182 N.E.3d 212, 216 (Ind. 2022). We also reject any argument that the Patients lack standing because their emotional-distress claim presents no cognizable "injury." *See* Amicus DTCI Br. at 10, 13, 14. Indiana courts have long held that emotional harms are redressable. *See, e.g., Dollar Inn, Inc. v. Slone*, 695 N.E.2d 185, 189 (Ind. Ct. App. 1998) (plaintiff need not prove actual exposure to communicable disease to support an emotional-distress claim).

Mindful of what the statute says and what it doesn't say, we "avoid interpretations that depend on selective reading of individual words that lead to irrational and disharmonizing results." *Id.* (internal citation and quotation marks omitted). What's more, we read the statutory language "logically and consistently with the statute's underlying policy and goals." *Culver Cmty. Tchrs. Ass'n v. Ind. Educ. Emp. Rels. Bd.*, 174 N.E.3d 601, 604–05 (Ind. 2021) (internal quotation marks and citation omitted). In other words, when "interpreting a statute, we must seek to give it a **practical** application," an approach designed to "prevent absurdity, hardship, or injustice, and to favor public convenience." *Pabey v. Pastrick*, 816 N.E.2d 1138, 1148 (Ind. 2004) (internal citation and quotation marks omitted) (emphasis added).

With this interpretive framework in mind, we conclude that the MMA covers **all** claims for "malpractice" by a "patient" against a "health care provider" (as those terms are defined in the Act) and that nothing in the Complaint Statute limits this scope of coverage. Our conclusion follows from the plain language of the Complaint Statute, and it aligns with decades of precedent, the Act's legislative history, and its overarching purpose. What's more, our reading of the Statute ensures compliance with the MMA's statute of limitations by patients, like those here, that may suffer from a latent bodily injury following an act of malpractice.

## A. The MMA applies to *all* claims for "malpractice" by a "patient" against a "health care provider," and nothing in the Statute's text limits this scope of coverage.

On first impression, the Patients raise a compelling argument. Indeed, in the absence of a specific definition under the MMA, the term "bodily injury" generally connotes "[p]hysical damage to a person's body." Black's Law Dictionary 906 (10th ed. 2014). *See also* Webster's Third New International Dictionary of the English Language Unabridged 245 (2002) (defining "bodily" as "physical" or "corporeal" as opposed to "mental or spiritual"), *id.* at 1164 (defining "injury" as "an act that damages, harms,

or hurts"). But a close reading of the Statute's plain text (set forth in full below) undermines the Patients' argument.

> Subject to IC 34-18-10 and sections 4 through 6 of this chapter, a patient or the representative of a patient who has a claim under this article for bodily injury or death on account of malpractice may . . . [f]ile a complaint in any court of law having requisite jurisdiction [and] exercise the right to a trial by jury.

I.C. § 34-18-8-1.

To begin with, the Statute simply specifies what a "patient" **may** generally do—file a complaint and exercise the right to trial by jury— when the patient has a particular claim under the Act—one "for bodily injury or death on account of malpractice." Though nothing in the Statute expressly authorizes a complaint for malpractice claims other than bodily injury or death, there's likewise **nothing** in the Statute that restricts a patient from suing for such other claims. *See Miller v. Terre Haute Reg'l Hosp.*, 603 N.E.2d 861, 864 (Ind. 1992) (stressing that the language of the Statute "**includes** an action for 'injury or death'") (quoting former I.C. § 16-9.5-1-6) (emphasis added).

Second, the Complaint Statute is expressly "[s]ubject to" several other provisions of the MMA—namely, code chapter 34-18-10 and sections 4 through 6 of code chapter 34-18-8. The first of these cited provisions governs the creation of a medical-review panel and charges that panel with "review[ing] proposed malpractice complaints against health care providers." I.C. § 34-18-10-1. Code section 34-18-8-4, in turn, prohibits a claimant from commencing "an action against a health care provider" in court before (1) the claimant presents the proposed complaint to a review panel and (2) the panel has issued its expert opinion. As exceptions to this procedural requirement, sections 5 and 6 of code chapter 34-18-8 permit a claimant to bypass the medical-review panel and commence a legal action for malpractice (1) if the claimant and all named defendants agree or (2) if

"the patient seeks damages from the health care provider in an amount not greater than fifteen thousand dollars." I.C. §§ 34-18-8-5, -6.

Each of these quoted statutory provisions—to which the Complaint Statute is expressly subject—contemplates a "**malpractice**" claim by a "**patient**" against a "**healthcare provider**." And these terms, unlike the term "bodily injury," are expressly defined in the MMA, effectively delineating what is—and what is not—covered by the Act:

- "Malpractice" refers to "a tort or breach of contract based on health care or professional services that were provided, or that should have been provided, by a health care provider, to a patient." I.C. § 34-18-2-18.

    - A "tort" means a "legal wrong, breach of duty, or negligent or unlawful act or omission proximately causing injury or damage to another." I.C. § 34-18-2-28.

- A "health care provider," in turn, is defined as (among other things) an individual, facility, or institution "licensed or legally authorized by this state to provide health care or professional services." I.C. § 34-18-2-14(1). Notably, this statutory definition encompasses individuals and facilities—psychiatric hospitals, psychologists, community mental-health centers, community intellectual-disability centers—that offer treatment for things other than physical injuries. I.C. §§ 34-18-2-14(1), (3).[2]

---

[2] Of course, these entities could cause bodily injury by, for example, administering the wrong type of medication. *See, e.g., Ball Mem'l Hosp., Inc. v. Fair*, 26 N.E.3d 674, 681 (Ind. Ct. App. 2015) (deceased patient's estate could pursue a claim for medical malpractice against a hospital's psychiatric unit for failure to "properly administer medications and monitor the effects of the medication") (internal quotation marks and brackets omitted). But the statutory definition of "malpractice," *supra*, doesn't restrict potential liability to such injury. Rather, the provider may be liable for any tort based on "health care or professional services." And "health care" refers broadly to any "act or treatment performed or furnished, or that should have been performed or furnished, by a health care provider for, to, or on behalf of a patient during the patient's medical care, treatment, or confinement." I.C. § 34-18-2-13.

- A "patient" refers to "an individual who receives or should have received health care from a health care provider, under a contract, express or implied." I.C. § 34-18-2-22. This definition "includes a person having a **claim of any kind**, whether derivative or otherwise, as a result of alleged malpractice." *Id.* (emphasis added).

In sum, the MMA covers all claims for "malpractice" by a "patient" against a "health care provider," as those terms are defined in the Act. And nothing in the Complaint Statute limits the MMA's application to claims involving only bodily injury or death.[3]

Still, the dissent concludes otherwise. As the "key" provision of the MMA that allows an "aggrieved patient to seek judicial relief at all," the dissent submits, the Complaint Statute "limits the complaints authorized under the act to those asserting claims 'for bodily injury or death on account of malpractice.'" *Post*, at 1. What's more, the dissent insists, the qualifications and exceptions to the Statute don't negate the Statute's "plain meaning" and the MMA's defined terms "do nothing to expand" the Statute "beyond claims for bodily injury or death." *Id.* at 3, 4.

This analytical approach, in our view, suffers from several flaws.

To begin with, the dissent would essentially have us interpret the Statute as imposing a mandatory condition precedent—an allegation of bodily injury or death—for a patient to file a complaint under the MMA. But the Statute imposes no such prerequisite to seek judicial relief. Rather,

---

[3] Even if we were to adopt the Patients' position, the Statute's cross-references to other provisions of the MMA and its internal references to "patient" and "malpractice" arguably render the term "bodily injury" ambiguous. And when a statute is ambiguous, we may resort to settled canons of statutory construction, *Rogers v. Martin*, 63 N.E.3d 316, 327 (Ind. 2016), application of which would lead us to the same conclusion, *see State v. Neukam*, 189 N.E.3d 152, 157 (Ind. 2022) (harmonious-reading canon directs courts to construe an ambiguous statute in a manner consistent with "related statutes on the same subject"); *Temme v. State*, 169 N.E.3d 857, 863 (Ind. 2021) (instructing courts to "avoid interpretations that depend on selective reading of individual words that lead to irrational and disharmonizing results") (internal citation and quotation marks omitted).

as emphasized above, the plain language of the Statute is permissive: a patient with a claim for bodily injury or death "may" file a malpractice complaint and "may" exercise the right to trial by jury. Nothing in the Statute precludes a patient from filing a claim other than one involving bodily injury or death. And to read such a limitation into the Statute diverges from basic principles of statutory interpretation. *See Garner v. Kempf*, 93 N.E.3d 1091, 1097 (Ind. 2018) (declining to impose certain statutory limitations where the legislature imposed no such limitations); *In re S.H.*, 984 N.E.2d 630, 635 (Ind. 2013) (stressing that "we will neither enlarge **nor restrict** [the] plain and obvious meaning" of a statute) (emphasis added); *State v. Parrott*, 69 N.E.3d 535, 540 (Ind. Ct. App. 2017) (observing that courts "may not read into a statute a restriction that the legislature did not include").

Arguably, under the negative-implication canon, the legislature's expression of "bodily injury or death" implies the exclusion of other types of claims. But this canon, we've stressed before, "must be applied 'with great caution, since its application depends so much on context.'" *Garner*, 93 N.E.3d at 1097 (quoting Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 107 (2012)). And here, context is critical, which leads us to our second point: It's not just the Statute's qualifications and exceptions that include defined terms expanding the scope of coverage; the Statute itself expressly references "malpractice" and "patient." I.C. § 34-18-8-1. Ignoring this context, the dissent's analysis would effectively render these defined terms meaningless. (When could a "patient" **ever** bring a "malpractice" claim for tort or breach of contract based on healthcare services?) Rather than reading certain terms or phrases in isolation, as the dissent would have us do, we avoid "irrational and disharmonizing results" by considering not only the plain meaning of the statutory text but also the language and "structure of the statute as a whole." *See ESPN*, 62 N.E.3d at 1195.

Finally, it's worth noting that the Statute isn't the only provision of the MMA that sets forth a procedure for an "aggrieved patient to seek judicial relief." *See post*, at 1. Code section 34-18-8-7 expressly permits a claimant to "commence an action in court for malpractice at the same time the

claimant's proposed complaint is being considered by a medical review panel." I.C. § 34-18-8-7(a). Rather than "merely recit[ing]" the Complaint Statute's limitations, *see post*, at 4, code section 34-18-8-7 imposes **no** "bodily injury" requirement at all.

### 1. Our understanding of the MMA's scope aligns with decades of precedent, the Act's legislative history, and its overarching purpose.

Aside from the Statute's plain text, our understanding of the MMA's scope aligns with Indiana case law, the Act's legislative history, and the Act's overarching purpose. Rather than telling us "more about a statute's meaning than does its text," *see post*, at 5, these sources simply offer analytical support, facilitating our process—and ultimate goal—of uncovering and giving proper effect to the legislature's intent, *see Town of Linden v. Birge*, 204 N.E.3d 229, 237 (Ind. 2023); *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2262 (2024) (turning to legislative history and other sources of commentary to underscore the "plain meaning" of the Administrative Procedure Act).[4]

This approach, we believe, embodies a rule of judicial humility. Rather than stand in "proud and silent isolation" from our colleagues in the General Assembly, *see* Benjamin N. Cardozo, *A Ministry of Justice*, 35 Harv. L. Rev. 113, 114 (1921), we approach our duty with a "a sense of common purpose," recognizing a "shared responsibility for the quality of statutes" that govern us, *see* Shirley S. Abrahamson & Robert L. Hughes, *Shall We Dance? Steps for Legislators and Judges in Statutory Interpretation*, 75 Minn. L. Rev. 1045, 1047 (1991). A strict textualist approach, by contrast, places an

---

[4] This is hardly a novel idea. As this Court emphasized over a century ago, the search for legislative intent may require us to "look to each and every part of the statute, to the circumstances under which it was enacted, to the old law upon the subject, if any, to other statutes upon the same subject or relative subjects, whether in force or repealed, to contemporaneous legislative history and to the evils and mischiefs to be remedied." *Haynes Auto. Co. v. City of Kokomo*, 186 Ind. 9, 13, 114 N.E. 758, 759 (1917).

unnecessary burden on legislators, forcing them to anticipate a virtually limitless range of implications from the choice of words they settle on in the drafting process.[5]

### a. Precedent

First, from a jurisprudential perspective, Indiana courts have long interpreted the MMA as encompassing a variety of tortious conduct committed by a healthcare provider against a patient, not just conduct resulting in bodily injury or death.[6] In *Howard Regional Health System v. Gordon*, for example, we held that the plaintiffs' spoliation claim fell within the purview of the MMA. 952 N.E.2d 182, 186 (Ind. 2011). The "skillful, accurate, and ongoing maintenance of test and treatment records bears strongly on subsequent treatment and diagnosis of patients," we

---

[5] Of course, the legislature is free to amend the statute if it disagrees with our interpretation. *See Durham ex rel. Estate of Wade v. U–Haul Int'l*, 745 N.E.2d 755, 761 (Ind. 2001) ("When it disagrees with judicial rulings, the legislature can act."). But to assume such a response ignores the realities of the legislative process—not to mention the limited time and resources with which our legislators work. While some cases may prompt a simple fix by our General Assembly, the legislative reexamination of a statute in other cases may depend on "whether the decision attracts adequate attention and creates sufficient demands on the legislative process to build another majority for a new enactment." *See* Shirley S. Abrahamson & Robert L. Hughes, *Shall We Dance? Steps for Legislators and Judges in Statutory Interpretation*, 75 Minn. L. Rev. 1045, 1055 (1991).

[6] The tort of medical malpractice predates the MMA, having evolved from the common-law duty of a healthcare provider to a patient. *Johnson v. St. Vincent Hosp., Inc.*, 273 Ind. 374, 387, 404 N.E.2d 585, 594 (1980), *overruled on other grounds by In re Stephens*, 867 N.E.2d 148 (Ind. 2007); *see also Ellenwine v. Fairley*, 846 N.E.2d 657, 660 (Ind. 2006) (describing the "substantive claim or cause of action at stake" in a medical-malpractice action as a "common law claim of negligence by a health care provider proximately causing personal injury or death"). And at common law in Indiana, a patient could recover for both physical and mental injuries sustained from negligent treatment by a healthcare provider. *See, e.g., Harrod v. Bisson*, 48 Ind. App. 549, 560, 93 N.E. 1093, 1097 (1911) (holding that, in an action against a physician for the negligent treatment of an injury resulting in permanent disfigurement, the plaintiff could recover for the "bodily suffering" as well as such "anxiety and distress of mind, as are fairly and reasonably the plain consequences of the injury") (internal citation and quotation marks omitted). The dissent apparently acknowledges this, *see post*, at *3*, but still insists that the Statute derogates from the common law, so it must be strictly construed to exclude claims other than those for death or bodily injury, *id.* at 2.

reasoned, finding it "difficult to contemplate that such a service falls outside the Act." *Id.*; *see also Cmty. Health Network, Inc. v. McKenzie*, 185 N.E.3d 368, 377 (Ind. 2022) (unanimously recognizing the MMA's application to claims of improper maintenance of medical records).

Indiana courts have also applied the MMA broadly to cover claims for emotional distress. In *Keim v. Potter*, for example, the Court of Appeals held that a patient mistakenly diagnosed with a "life-altering and deadly disease" could maintain a malpractice claim for emotional damages under the modified-impact rule—a rule that requires the plaintiff to sustain a direct impact by the tortfeasor without the need to show physical injury. 783 N.E.2d 731, 735 (Ind. Ct. App. 2003) (citing *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991)).[7]

In another case, *Spangler v. Bechtel*, the parents of a stillborn child brought a medical-malpractice claim for emotional distress against a hospital, alleging negligence in the provision of obstetrical care and inadequate supervision of staff. 958 N.E.2d 458, 460–61 (Ind. 2011). The defendant-hospital argued that, "because neither of the parents suffered physical injury," their emotional-distress claim amounted only to "one derivative of an injury to a patient covered by the MMA." *Id.* at 469. And because their unborn child was not a "patient" under the MMA, the hospital claimed, the Act barred the parents from filing any such derivative claim. *Id.* Rejecting that argument, this Court concluded that

---

[7] Despite its strenuous insistence that only the "plain meaning" of the Statute's text is what matters, the dissent—ironically—finds it necessary to engage in an extended discussion of precedent that stands "in tension" with what the Court holds today. *Post*, at 5, 7–8. We acknowledge cases in which we've suggested or summarily concluded that the MMA covers only claims for "bodily injury or death." *See Lake Imaging, LLC v. Franciscan All., Inc.*, 182 N.E.3d 203, 205, 208 (Ind. 2022) (citing the Statute for the proposition that the "MMA is intended to cover only claims for bodily injury or death, not claims for breach of contract"); *Ind. Patient's Comp. Fund v. Patrick*, 929 N.E.2d 190, 192 (Ind. 2010) (observing prior decisions in which this Court held "that the requirement for bodily injury (or death) applies to the actual victim of the malpractice and not to derivative claimants"). But those cases, as the dissent recognizes, didn't require us to resolve the precise question before us today—whether the lack of "bodily injury" forecloses application of the MMA to a patient's claim of malpractice. *See post*, at 1, 9.

"claims of emotional distress represent injuries *directly* inflicted on a plaintiff and are not derivative in the traditional sense." *Id.* at 471. The MMA's definition of a "patient," the Court stressed, "includes 'a person having a *claim of any kind, whether derivative <u>or otherwise</u>, as a result of alleged malpractice on the part of a health care provider*.'" *Id.* (quoting I.C. § 34-18-2-22) (emphases added by the *Spangler* Court). This italicized language, the Court observed, "assures the expansive applicability of the MMA . . . to a variety of actions alleging medical negligence." *Id.* at 471–72. So, while a third-party derivative claim may be subject to the MMA only if the primary claim is too, *see post*, at 4 (citing *Cutchin v. Beard*, 171 N.E.3d 991, 995 (Ind. 2021)), that's beside the point. Primary claims for "negligent infliction of emotional distress, if arising from alleged medical malpractice, are subject to the MMA not because they are derivative but because they are '*otherwise' a result of alleged malpractice*." *Spangler*, 958 N.E.2d at 472.

Beyond these cases, Indiana courts have applied the MMA to a doctor's alleged failure to diagnose a patient, a hospital board's alleged negligent credentialing of a physician, a family member's claim for loss of services, allegations of a doctor's fraudulent representation of treatment methods, and a provider's allegedly improper selection of medications and failure to properly investigate its chosen pharmacy's manufacturing process. *See, respectively, Martin v. Richey*, 711 N.E.2d 1273, 1278 (Ind. 1999); *Winona Mem'l Hosp., Ltd. P'ship v. Kuester*, 737 N.E.2d 824, 828 (Ind. Ct. App. 2000); *Yee Lee v. Lafayette Home Hosp., Inc.*, 410 N.E.2d 1319, 1324 (Ind. Ct. App. 1980); *Van Sice v. Sentany*, 595 N.E.2d 264, 266–67 (Ind. Ct. App. 1992); *Robertson v. Anonymous Clinic*, 63 N.E.3d 349, 361 (Ind. Ct. App. 2016).

The MMA, of course, "does not encompass every tort claim arising as a consequence of a patient-physician relationship." *Collins v. Thakkar*, 552 N.E.2d 507, 509 (Ind. Ct. App. 1990). Allegations of ordinary premises liability, for example, fall outside the scope of the Act. *Methodist Hosp. of Ind., Inc. v. Ray*, 551 N.E.2d 463, 469 (Ind. Ct. App. 1990), *opinion adopted*, 558 N.E.2d 829 (Ind. 1990). But restricting "malpractice" claims under the MMA to those involving only "bodily injury or death" would upend decades of Indiana precedent.

### b. Legislative History and Purpose

We find further support for our conclusion in the Act's legislative history and overarching purpose. *See Yee Lee*, 410 N.E.2d at 1323 (finding it "proper to consider the historical background" leading to the MMA's enactment when interpreting the Act and "ascertaining legislative intent").

In the years leading up to the MMA's enactment in 1975, "Indiana's health care system was on the verge of a crisis." Otis R. Bowen, *Medical Malpractice Law in Indiana*, 11 J. Legis. 15, 15 (1984). Lawsuits for malpractice claims had grown precipitously since the Second World War—the result of increased expectations of care from patients and a general breakdown in "rapport between doctors and patients." *Id.* at 16. This growth in litigation, combined with a ballooning of damage awards and a corresponding rise in malpractice-insurance premiums, prompted many doctors to reduce the services they offered, refuse to perform high-risk procedures, or leave their profession altogether. *Id.* at 15–16.

To reverse this trend, the MMA created measures to mitigate the cost of insuring and defending malpractice claims. Specifically, the Act imposed a damages "award cap, a restrictive statute of limitations, and an attorney fee limitation." *Id.* at 18. What's more, the MMA required a person to first file a claim with "an arbitration panel, thereby removing the action from litigation except for judicial review of the panel's final decision." *Id.* While designed to promote the "settlement of claims," the intended purpose of the review panel was "**not** to adversely affect a claimant" in pursuing his legal claim. *Id.* at 22–23 (emphasis added). Rather, the MMA permitted a claimant to file a malpractice complaint "in any court having requisite

jurisdiction," thus preserving the "right to trial by jury." *Id.* at 18 (citing former code section 16-9.5-1-6).[8]

Conspicuously absent from the MMA's legislative history is any expression of the legislature's intent for the Act to cover only certain malpractice claims or to exclude certain healthcare providers. To the contrary, in its findings that led to the Act's passage, the legislature cited the increase in "suits and claims for damages arising from **professional patient care**" and the corresponding increase in "cost of providing **health care services**." H. Journal, 99th Gen. Assemb., 1st Reg. Sess. 577, 578 (1975) (emphases added). Such broad language, it's safe to assume, reflected the general recognition at the national level that the "genesis of virtually every malpractice claim or suit" at the time was "a **physical or mental injury or other adverse result** of treatment sustained by the patient." U.S. Dep't of Health, Educ. & Welfare, Medical Malpractice: Report of the Secretary's Commission on Medical Malpractice 22 (1973) (emphasis added).

These "conditions" ultimately "implicated the vital interests of the community in the availability of the **professional services of physicians and other health care providers**." *Johnson v. St. Vincent Hosp., Inc.*, 273 Ind. 374, 379, 404 N.E.2d 585, 590 (1980), *overruled on other grounds by In re Stephens*, 867 N.E.2d 148 (Ind. 2007) (emphasis added). And this concern with preserving access to the "professional services" of all "health care providers," in turn, reflected the scope of the Act's coverage. The definition of "health care provider" under the original 1975 measure, included a "psychologist." Pub. L. No. 146-1975, § 1, 1975 Ind. Acts 854, 854 (originally codified at I.C. § 16-9.5-1-1(a)). The following year, the Medical Malpractice Study Commission recommended several

---

[8] The language of the Complaint Statute reflects nearly verbatim the language used in the 1975 MMA. *See* Pub. L. No. 146-1975, § 1, 1975 Ind. Acts 854, 856, 864 (originally codified at I.C. § 16-9.5-1-6) (specifying that, subject to certain procedural requirements, "a patient or his representative having a claim under this article for bodily injury or death on account of malpractice may file a complaint in any court of law having requisite jurisdiction and demand right of trial by jury").

amendments to the MMA, including expanded coverage to psychiatric hospitals and community mental-health centers. Final Report of the Medical Malpractice Study Commission § 4.100, at 3 (Dec. 31, 1976). The General Assembly followed through with this recommendation at its subsequent session, amending the definition of "health care provider" to include a "community mental health center" and "community mental health clinic." Pub. L. No. 65-1976, § 1, 1976 Ind. Acts 287, 287.

From this "historical perspective," we find the conclusion "inescapable that our General Assembly intended that **all actions the underlying basis for which is alleged medical malpractice** are subject to the act." *Yee Lee*, 410 N.E.2d at 1324 (emphasis added).

### 2.  The MMA must cover *potential* bodily injury, not just contemporaneous bodily injury, for the Patients to meet the statute of limitations.

Finally, we emphasize that our reading of the Statute ensures compliance with the MMA's statute of limitations by patients, like those here, that may suffer from a latent bodily injury following an act of malpractice.

The MMA requires a litigant to file a claim "within two (2) years after the date of the alleged act" of malpractice. I.C. § 34-18-7-1(b). Otherwise, the claim is barred. *Id.* We've interpreted this statute as imposing an "occurrence" based—rather than a "discovery" based—limitations period. *Martin*, 711 N.E.2d at 1279–80. In other words, the MMA's statute-of-limitations clock starts ticking "at the time of the act of malpractice rather than from the date on which the malpractice is discovered." *Id.*

Though this limitations period has long withstood facial challenges to its constitutionality, we've held that its application is unconstitutional when the "plaintiff did not know or, in the exercise of reasonable diligence, could not have discovered that she had sustained an injury as a result of malpractice." *Id.* at 1283, 1284. Were it otherwise, "the statute of limitations would impose an impossible condition on plaintiff's access to

courts and ability to pursue an otherwise valid tort claim." *Id.* at 1284. To ensure its uniform application, the MMA's limitation period may not "preclude a plaintiff from filing a claim simply because she has a disease which has a long latency period and which may not manifest" itself for several years after the alleged malpractice. *Van Dusen v. Stotts*, 712 N.E.2d 491, 493 (Ind. 1999). In such cases, the two-year limitations period begins to run from "the date on which" the plaintiff receives "information that there is a reasonable possibility that a specific injury was caused by a specific act at a specific time." *Id.* at 499.

Here, the Patients received a letter from the Hospital in November 2019, informing them that they "may have [been] exposed" to certain viruses due to a technician's failure to fully sterilize certain surgical instruments used on the Patients sometime between April and September of that year. App. Vol. 2, pp. 83, 131. The Patients' receipt of this letter triggered the running of the limitations period, *see Van Dusen*, 712 N.E.2d at 499, which they complied with by filing their complaint the same month. To be sure, "none" of the Patients had "contracted [any] disease or suffered any physical harm" at the time they sued the Hospital. *See* App. Vol. 2, p. 64. And even today, the Patients disclaim any such bodily injury. *See* Appellants' Supp. Resp. Br. at 19. But given the possible latent effects of the alleged tortious conduct, and thus the uncertainty of harm, the Patients took the proper course of action by filing their complaint and framing their malpractice claim as one of **potential** bodily injury that required ongoing "medical testing" for infectious diseases—including "potentially incurable and fatal" ones—for "months or years to come." App. Vol. 2, pp. 83, 93–94. Had they instead taken a wait-and-see approach for more than two years after receiving the letter, the MMA would have barred their claim. *See Van Dusen*, 712 N.E.2d at 499.

### B.  The Patients' emotional-distress claim sufficiently alleges a "bodily injury."

Even if we were to read the Statute as restricting malpractice complaints to those alleging "bodily injury or death," we find the Patients' emotional-distress claim sufficiently alleges such a "bodily injury." Under

the modified-impact rule, a plaintiff may recover damages for emotional distress when he or she "sustains a direct impact by the negligence of another and" because "of that direct involvement sustains an emotional trauma" serious enough to affect a "reasonable person." *Shuamber*, 579 N.E.2d at 456. Of course, the "direct physical impact" necessary to support an emotional-distress claim "need not cause a physical injury to the plaintiff and the emotional trauma suffered by the plaintiff need not result from a physical injury caused by the impact." *Conder v. Wood*, 716 N.E.2d 432, 434 (Ind. 1999). The Patients are correct, then, in their observation that a physical impact "is not inherently the same as 'bodily injury.'" *See* Appellants' Supp. Resp. Br. at 20.

But under Indiana's "impact rule," which required a physical injury to support an emotional-distress claim, it took little to establish such an injury. While presumably more than a mere touching,[9] a "physical injury" need not have been "permanent" or even "substantial." *See Kroger Co. v. Beck*, 176 Ind. App. 202, 205, 375 N.E.2d 640, 643 (1978) (finding that "permanent or substantial physical injury is not required and has not been required by the law"). In *Kroger*, for example, the Court of Appeals found sufficient evidence to support an emotional-distress claim where the plaintiff sustained a slight "prick" to the back of her throat from a small needle lodged in her food—an injury that required no medical attention and left no scarring.[10] *Id.* at 203–04, 375 N.E.2d at 642–43. And in *Dollar Inn, Inc. v. Slone*, the Court of Appeals held that the plaintiff satisfied the

---

[9] In *Little v. Williamson*, the Court of Appeals stopped short of opining on whether the "impact rule requires actual harm or if mere physical contact is sufficient." 441 N.E.2d 974, 975 n.3 (Ind. Ct. App. 1982).

[10] In support, the *Kroger* panel surveyed decisions from other jurisdictions, citing cases in which courts have upheld emotional-distress claims where the plaintiff temporarily choked on a small foreign object buried in her pineapple pie, where the plaintiff became "violently nauseated" after finding a "rusty safety pin and some debris" in the soda she was drinking, and where the plaintiff temporarily suffered from smoke inhalation due to the absence of a fire escape. 176 Ind. App. at 205 n.1, 206, 375 N.E.2d at 643 n.1, 644 (citing *Miller v. Meadville Food Serv., Inc.*, 98 A.2d 452 (Pa. 1953); *Duley v. Coca-Cola Bottling Co. of St. Louis, Mo.*, 232 S.W.2d 801, 802 (Mo. App. 1950); *Morton v. Stack*, 170 N.E. 869, 869 (Ohio 1930)).

impact rule where she feared possible exposure to infectious diseases after sustaining a prick from a hypodermic needle concealed in a hotel bathroom—a "physical injury" neither "substantial [n]or permanent in nature." 695 N.E.2d 185, 189 (Ind. Ct. App. 1998) (citing *Kroger*).

Based on this precedent, we consider the Hospital's alleged tortious conduct here—the use of unsterilized surgical instruments that potentially exposed the Patients to infectious diseases—sufficient to constitute a "bodily injury" under the impact rule governing claims for emotional distress. Indeed, for purposes of establishing such an injury, we find little distinction between a subcutaneous prick of a hypodermic needle and the insertion of a foreign object into a patient's body during an invasive medical procedure.

\* \* \* \*

Having resolved the threshold question of the MMA's applicability to the Patients' claim, we now turn to the procedural issue before us— whether the trial court had jurisdiction to preliminarily determine class certification under the Act.

## II. The trial court had jurisdictional discretion to preliminarily determine class certification.

The MMA generally requires a medical-review panel to first "render an opinion on a claimant's proposed complaint before the claimant can sue a health-care provider in court." *Cmty. Health Network, Inc.*, 185 N.E.3d at 376 (citing I.C. § 34-18-8-4). A claimant may, however, "commence an action in court for malpractice at the same time the claimant's proposed complaint is being considered by a medical review panel." I.C. § 34-18-8-7(a).[11] When this happens, like here, the trial court has "limited authority to assert jurisdiction over threshold issues while a proposed complaint is

---

[11] The complaint "may not contain any information that would allow a third party to identify the defendant," thus the Hospital's anonymity here. *See* I.C. § 34-18-8-7(a)(1).

pending before the medical review panel." *Lorenz v. Anonymous Physician #1*, 51 N.E.3d 391, 396 (Ind. Ct. App. 2016) (citing I.C. § 34-18-8-7(a)(3)).

This "limited authority" under the MMA **permits** the trial court to, among other things,[12] "preliminarily determine an affirmative defense or issue of law or fact that may be preliminarily determined under the Indiana Rules of Procedure." I.C. § 34-18-8-7(a)(3); I.C. § 34-18-11-1(a)(1). However, the MMA expressly **prohibits** a trial court from issuing a preliminary determination on "any affirmative defense or issue of law or fact reserved for written opinion by the medical review panel." I.C. § 34-18-11-1(b). These reserved issues of law or fact include opinions on whether the evidence supports the "conclusion that the defendant or defendants failed to comply with the appropriate standard of care" and whether the "conduct complained of was or was not a factor of the resultant damages." I.C. §§ 34-18-10-22(b)(1), (2), (4).

The question here is whether class certification amounts to an improper preliminary determination by the trial court. For the reasons below, we conclude that it is not.

## A. The *Griffith* Court took an overly narrow approach to preliminary-determination jurisdiction.

In arguing that class certification falls beyond the statutory scope of a trial court's preliminary-determination jurisdiction, the Hospital relies on this Court's decision in *Griffith v. Jones*, 602 N.E.2d 107 (Ind. 1992). In that case, the deceased patient's estate filed a proposed complaint with the DOI, alleging malpractice for the doctor's failure to obtain informed consent before conducting surgery from which the patient died. *Id.* at 108–09. The estate also sought a preliminary determination, asking the trial court to construe a term under the MMA, to "order the medical review panel to find that there were material issues of fact not requiring expert

---

[12] *E.g.*, set a trial date, compel discovery, and issue summonses. I.C. § 34-18-8-7(a)(3); I.C. § 34-18-11-1(a)(2); I.C. § 34-18-11-2(c).

opinion bearing on liability" for lack of informed consent, and to "enter partial summary judgment in her favor on the issue of informed consent." *Id.* at 109. The trial court denied the summary-judgment motion but granted the other two requests. *Id.*

On transfer, this Court held that the trial court exceeded its authority under the MMA to preliminarily determine the law. *Id.* at 110. The power to preliminarily determine certain matters "is to be narrowly construed," the Court explained, stressing the lack of statutory authority to dictate "either the content of the panel's opinion or the manner in which the panel arrives at its opinion, or the matters that the panel may consider in arriving at its opinion." *Id.* As such, the Court held that the MMA "specifically limits" a trial court to "preliminarily determining affirmative defenses under [the] Trial Rules" and to "deciding issues of law or fact that may be preliminarily determined under Trial Rule 12(D)." *Id.* The Court also held that trial courts lack jurisdiction to "instruct the medical review panel [on] definitions of terms and phrases" under the MMA, "the evidence that it may consider in reaching its opinion, or the form or substance of its opinion." *Id.* at 111.

Though *Griffith* has long served as the standard bearer for defining the parameters of a trial court's preliminary-determination jurisdiction, we believe the Court in that case took an overly narrow approach to the issue. As such, we accept the Patients' invitation to revisit our holding in that case. *See* Resp. in Opp. to Trans. at 20.

To begin with, while Trial Rule 12(D) itself is titled "Preliminary Determination[s]," the MMA does not restrict a trial court's preliminary determinations to those under that specific rule. To the contrary, the plain language of the Act allows for a preliminary determination of "an affirmative defense or issue of law or fact that may be preliminarily determined under the Indiana **Rules** [plural] of Procedure." I.C. § 34-18-11-1(a)(1) (emphasis added). And as the Patients point out, "numerous other preliminary motions may be presented and determined" which are not included in Trial Rule 12(D). Resp. in Opp. to Trans. at 21 (internal citation omitted). Such motions may include a motion for enlargement of time under Trial Rule 6(B), a motion for a more definite statement under

Trial Rule 12(E), a motion to strike under Trial Rule 12(F), a motion for a supplemental pleading under Trial Rule 15(D), a motion to drop or add a party under Trial Rule 21, a motion to intervene under Trial Rule 24(C), and a motion to substitute parties under Trial Rule 25. William F. Harvey, 1A Ind. Practice, Rules of Procedure Annotated, Trial Rule 12 § 12.15, at 329 (3d ed. 1999); *see also Boggs v. Tri-State Radiology, Inc.*, 730 N.E.2d 692, 694–95 (Ind. 2000) (applying the "summary judgment standard of Trial Rule 56" to a motion for preliminary determination). In fact, restricting a trial court's preliminary determinations to those under Trial Rule 12(D) would have precluded the Fund from intervening (under Trial Rule 24) and the Hospital from joining in the motion to consolidate (under Trial Rule 42(D)).

Second, while *Griffith* restricted trial courts to "deciding issues of law or fact that may be preliminarily determined under Trial Rule 12(D)," 602 N.E.2d at 110, we've suggested in other cases a broader reading of the trial court's preliminary-determination jurisdiction.

In *State ex rel. Hiland v. Fountain Circuit Court*, the plaintiffs filed a proposed malpractice complaint with the DOI against a doctor and two hospitals. 516 N.E.2d 50, 51 (Ind. 1987). After filing their claim with the trial court (pending the review panel's determination), the plaintiffs moved for a change of venue to keep "all three defendants in the same lawsuit." *Id.* at 51, 52. The doctor, in turn, moved to dismiss, arguing that a preliminary "determination of venue is not a proper purpose for invoking the jurisdiction of the trial court" under the MMA. *Id.* at 52. This Court rejected that argument as too "strict [an] application" of the MMA, holding that, in "multiple defendant actions," an "advance resolution of change of venue" is a proper "preliminary determination for resolution" under the trial court's "limited subject matter jurisdiction." *Id.* (internal quotation marks omitted). A change-of-venue determination, the Court reasoned, "will enhance, not deter, the objectives" of the MMA. *Id.* And while the Court cited Trial Rule 12(D), the opinion makes clear that the plaintiffs moved for a change of venue, not as a defense under Trial Rule

12(B) but, rather, after the "striking of counties" under Trial Rule 76.[13] *See id.* at 51, 52.

In sum, the plain language of the MMA allows for a preliminary determination of "an affirmative defense or issue of law or fact that may be preliminarily determined under the Indiana Rules of Procedure," including Rules other than Trial Rule 12(D). I.C. § 34-18-11-1(a)(1). The Act **only** prohibits a trial court from issuing a preliminary determination on an "affirmative defense or issue of law or fact" reserved for the panel's expert opinion—*i.e.*, whether the defendant "failed to comply with the appropriate standard of care" and whether the conduct factored into the "resultant damages." I.C. §§ 34-18-10-22(b)(1), (2), (4); I.C. § 34-18-11-1(b). In other words, "an issue that does not require expert opinion is not reserved to the medical review panel" and may be subject to preliminary determination by the trial court. *Miller v. Martig*, 754 N.E.2d 41, 44–45 (Ind. Ct. App. 2001). Of course, such a determination may affect, to one extent or another, "the manner in which the panel arrives at its opinion" or perhaps even the "matters that the panel may consider in arriving at its opinion."[14] *See Griffith*, 602 N.E.2d at 110. But we consider that permissible

---

[13] The *Hiland* Court further recognized that a change-of-judge determination falls among the issues of law or fact which a trial court may preliminarily determine under the MMA. *See State on Rel. of Vencare, Inc. v. LaGrange Cir. Ct.*, 547 N.E.2d 847, 848 (Ind. 1989) (reciting the holding in *Hiland*). And nothing in Trial Rule 12 addresses such a determination.

[14] The trial court, for example, may compel discovery, I.C. § 34-18-11-1(a)(2), ultimately shaping the evidence considered by the panel. *See, e.g., Terre Haute Reg'l Hosp., Inc. v. Basden*, 524 N.E.2d 1306, 1312 (Ind. Ct. App. 1988) (holding, in a malpractice claim alleging negligent supervision, that the trial court had preliminary-determination jurisdiction to order the panel's compliance with the plaintiff's requests for information on surgical procedures unrelated to those performed on the plaintiff). And Indiana courts have even affirmed the entry of summary judgment in the context of a motion for preliminary determination, thus precluding panel review altogether. *See, e.g., Boggs v. Tri-State Radiology, Inc.*, 730 N.E.2d 692, 694–95 (Ind. 2000) (affirming entry of summary judgment on a motion for preliminary determination raising a statute-of-limitations defense); *Wood v. Schuen*, 760 N.E.2d 651, 654, 656 (Ind. Ct. App. 2001) (affirming entry of summary judgment on a motion for preliminary determination where claimant presented no evidence of a physician-patient relationship).

so long as it "will enhance, not deter, the objectives" of the MMA. *See Hiland*, 516 N.E.2d at 52.

With this standard in mind, we proceed to address the Hospital's remaining claims.

## B. A class-certification determination does not dictate the substance of a review panel's opinion.

The Hospital contends that, because a class-certification determination requires a trial court to make findings of fact and to "evaluate and compare the underlying claims of the putative class members," such a determination, which implicates the "merits of the claims," exceeds the trial court's statutory authority. Pet. to Trans. at 17–18. *See, e.g.*, Ind. Trial Rule 23(B)(3) (requiring the trial court to find "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members").

We disagree.

As noted above, the MMA specifically states that the trial "court has no jurisdiction to rule preliminarily upon any affirmative defense or issue of law or fact **reserved for written opinion by the medical review panel**." I.C. § 34-18-11-1(b) (emphasis added). Those reserved issues, to reiterate, involve the review panel's "conclusion that the defendant or defendants failed to comply with the appropriate standard of care" and whether the "conduct complained of was or was not a factor of the resultant damages." I.C. §§ 34-18-10-22(b)(1), (2), (4).

A class-certification determination falls outside these reserved issues and thus does **not** exceed the scope of the trial court's jurisdiction, so long as the court's order doesn't "instruct the medical review panel" on the "form or substance of its opinion." *Griffith*, 602 N.E.2d at 111. In *Griffith*, the motion for preliminary determination at issue essentially asked the trial court to directly interfere with the review panel's deliberations and opinions. *See id.* at 109 (summarizing facts in which the estate asked the court to "order the medical review panel to find that there were material

issues of fact not requiring expert opinion," to construe a statutory term, and to enter partial summary judgment on the issue of informed consent). That is not the case here.

To be sure, Trial Rule 23 may require the trial court to find "questions of law or fact common to the members," thus implicating the underlying merits of the claims. But a "certification hearing is not intended to be a trial on the merits, and Trial Rule 23 does not require a potential class representative to show a likelihood of success on the merits in order to have his claim certified as a class action." *N. Ind. Pub. Serv. Co. v. Bolka*, 693 N.E.2d 613, 617 (Ind. Ct. App. 1998). In other words, any findings made by the trial court related to "questions of law or fact" don't decide the parties' substantive claims—let alone dictate the review panel's conclusions on those substantive claims.

## C. Though it may affect the manner in which the panel arrives at its opinion, class certification aligns with the MMA's overall purpose.

Beyond affecting the substance of a review panel's opinion, class certification, the Hospital contends, would improperly dictate the **procedure** in which the panel arrives at its opinion and the **evidence** it may consider. Specifically, the Hospital argues that class certification will require the trial court "to determine if a single panel must consider the claims of thousands of patients, or whether a [panel] must be formed for each patient." Pet. to Trans. at 19. And granting a motion for class certification, the Hospital submits, would exempt all but the named plaintiffs from presenting their claims (and evidence) to the panel for review. *Id.* at 20, 21. The IHA makes a similar argument, insisting that class certification would contravene the "core purpose" of the MMA— preserving healthcare services in Indiana—by "eliminating the mandate that each claim be individually reviewed by a medical review panel." Amicus IHA Br. at 8, 10.

Again, we disagree.

First, we acknowledge that a class-action proceeding "circumvents the need" for all potential claimants to "file individual claims" with a medical-review panel. *See Budden*, 698 N.E.2d at 1163 (internal citation and quotation marks omitted). But the purpose of the review panel is to promote the "settlement of claims" by avoiding lawsuits when possible, "**not** to adversely affect a claimant" in pursuing his legal claim. Bowen, *supra*, at 22–23. Indeed, the legislature designed the MMA to protect the viability of Indiana's healthcare system by creating measures to mitigate costs of insuring and defending malpractice claims. *Howard Reg'l Health Sys.*, 952 N.E.2d at 186. And that purpose aligns with the purpose of a class-action proceeding—the "promotion of efficiency and economy of litigation" in cases involving multiple parties with similar claims. *See Ind. Univ. v. Thomas*, 167 N.E.3d 724, 730 (Ind. Ct. App. 2021) (internal citation and quotation marks omitted). As this Court stressed in *Hiland*, "just and efficient judicial administration is not served by the sanctioning of a procedure that unnecessarily requires duplicitous multiple trials of the same factual issues, nor by inviting the prospect of inconsistent and contradictory verdicts." 516 N.E.2d at 52. Requiring the formation of an individual review panel for each of the 1,000 or more potential claimants here would sanction such an inefficient procedure—burdening the medical experts that serve on these panels, straining the resources of the DOI, and ultimately taxing the state's healthcare industry.

Second, the MMA not only contemplates "multiple plaintiffs" before a medical-review panel, I.C. § 34-18-10-7, it also permits a "representative of a patient," rather than the patient herself, to file a malpractice claim with the panel, I.C. § 34-18-8-1. The MMA defines a "representative" as, among other things, a "legal agent of the patient." I.C. § 34-18-2-25. And a named plaintiff in a class action may act in this "representative" capacity, so long as he or she "fairly and adequately protect[s] the interests of the class." Ind. Trial Rule 23(A)(4). Even if a named plaintiff in a class action falls outside the MMA's definition of a "representative," this Court has held that class certification is appropriate so long as the "named plaintiffs," rather than "all the members of the putative class," met "the jurisdictional requirements of the statute by exhausting their administrative remedies

before bringing their action" in court. *Clark v. Lee*, 273 Ind. 572, 574, 575, 406 N.E.2d 646, 648, 649 (1980).[15]

Third, allowing the named plaintiffs alone to present their claims need not limit the evidence considered by the review panel. As a prerequisite to a class action, the named plaintiff must show that there are "questions of law or fact common to the class." Ind. Trial Rule 23(A)(2). Courts consider this "commonality" requirement satisfied if the named plaintiff's claim derives "from a common nucleus of operative fact" or a "common course of conduct." *LHO Indianapolis One Lessee, LLC v. Bowman*, 40 N.E.3d 1264, 1271 (Ind. Ct. App. 2015) (internal citation and quotation marks omitted). If the Patients can satisfy this prerequisite, each putative class member would need to prove an identical (or virtually identical) set of facts to recover damages under the MMA.

Finally, and perhaps most importantly, this Court's acceptance of the Hospital's argument would effectively eliminate class actions from all medical-malpractice claims. The legislature clearly knows how to eliminate—and, in fact, has eliminated—this procedural device in other contexts. *See, e.g.*, I.C. § 34-12-5-7 (prohibiting class-action claims against certain covered entities for breach-of-contract or unjust-enrichment claims for losses arising from COVID-19). Yet nothing in the MMA indicates such an intent and we decline to read a class-action bar into the Act. *See Budden*, 698 N.E.2d at 1161 (finding "no prohibition against class actions" in the text of the Tort Claims Act).

---

[15] *Clark* involved a class-action claim in which plaintiffs representing non-resident workers challenged the constitutionality of the Indiana Occupational Income Tax Act. 273 Ind. at 573, 574, 406 N.E.2d at 648.

### D.  A healthcare provider *must* warn of a subsequently discovered medical error with potentially harmful consequences.

Finally, as a policy matter, the IHA argues that premature class certification would potentially chill the disclosure of "potential medical errors, non-harmful errors, and near-misses," which, Amicus insists, runs contrary to the "culture of open communications" and accountability promoted by the State Department of Health's Indiana Medical Error Reporting System (IMERS). Amicus IHA Br. at 11–12. *See* Ind. State Dep't of Health, Indiana Medical Error Reporting System: Final Report (Dec. 2019) (hereinafter IMERS Report).

We generally agree with the IHA that preemptive class certification could "potentially chill" disclosure of patient information, at least when "the occurrence of an adverse event is uncertain, may not be obvious or severe, or where potential harm may only be evident." *See* Amicus IHA Br. at 12. But the Hospital here didn't just commit a "potential medical error" or a "near miss." Rather, it committed a **clear** medical error with **potentially** harmful or even fatal consequences. Indeed, in the letter it sent to all potentially affected patients, the Hospital explained that, over the course of several months, one of its technicians "**did not**" complete the full sterilization process of surgical instruments.[16] App. Vol. 2, p. 131 (emphasis added). And this failure to sterilize, the Hospital admitted, "may have exposed" the patients to certain viruses, including the Hepatitis C virus, the Hepatitis B virus, and HIV. *Id.*

Such an error would be a "reportable event" under the IMERS if it were to result in "serious disability." *See* IMERS Report at 12 (defining "reportable events" as including errors that result in a patient's "serious disability associated with the use of contaminated . . . devices . . . provided

---

[16] While this language is taken from the letter sent specifically to Linda Gierek, the Hospital cites it as representative of the letter sent to all patients who underwent a surgical procedure at its facility during the timeframe identified. App. Vol. 4, pp. 22, 55–56.

by the facility").[17] And while the error may ultimately not result in a "serious disability," the IMERS requires the healthcare facility to "have a process in place for accurately and timely determining the occurrence of a **potential** reportable event." *Id.* at 8 (emphasis added). When "an event occurs that **may** constitute a reportable event," the IMERS directs referral of that event to the facility's "quality assessment and improvement program for review." *Id.* (emphasis added). And this review encompasses "in-depth analyses of events that may have been caused by medical error." *Id.* Indeed, where the potential for harm isn't immediately known, such an analysis would presumptively include contacting the potentially affected patients to inform them of the error and to take steps to rule out the possibility of harm. And that's precisely what the Hospital did here by offering patients "free lab testing services to verify the absence or presence of any" viruses to which they may have been exposed. *See* App. Vol. 2, p. 131.

Aside from the IMERS policy and guidance, this Court has expressly recognized a healthcare provider's legal duty to warn of subsequently discovered safety issues. *Harris v. Raymond*, 715 N.E.2d 388, 393 (Ind. 1999). In *Harris*, we held that a physician has "a specific duty to warn a patient that a medical device previously placed in the patient" by the physician "may be unsafe and to urge them to get follow-up care when the manufacturer and/or the FDA have issued safety alerts regarding the medical device." *Id.* at 394. While the facts of *Harris* are distinguishable from the circumstances here, we find the duty to warn equally—if not more—imperative when the provider itself (rather than an outside party) discovers the potential safety issue. What's more, the *Harris* Court's reasons for imposing a duty to warn embody a universal principle in healthcare: Given the nature of the doctor-patient relationship, the Court explained, "it is essential that the health care provider disclose material

---

[17] If, on the other hand, this were simply a "near miss" with no potential for harm—*e.g.,* the "wrong patient is taken to the surgery department, but it is caught before surgery is performed on the patient"—the Hospital would likely have no obligation to disclose the matter. *See* IMERS Report at 7.

facts to the patient at appropriate times during the course of the patient's treatment so that the patient may make informed decisions about health care issues." *Id.*

Simply put, in instances where, like here, a clear medical error has the potential for harm, the provider **may not** "hesitate to share" information with the patient. *See* Amicus IHA Br. at 12.

# Conclusion

For the reasons above, we hold (1) that the MMA applies to the Patients' claims and (2) that the trial court had jurisdiction to preliminarily determine class certification. We thus affirm in part and reverse in part and "remand for the trial court to consider what, if any, barriers to certification remain." *See Budden*, 698 N.E.2d at 1166.

Rush, C.J., concurs.
Massa, J., concurs in the judgment.
Slaughter, J., concurs in the judgment in part and dissents in part with separate opinion in which Molter, J., joins.

ATTORNEYS FOR APPELLANTS
Eric S. Pavlack
Colin E. Flora
Pavlack Law, LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES
James L. Hough
Alyssa Stamatakos
Eichhorn & Eichhorn, LLP
Hammond, Indiana

ATTORNEYS FOR INTERVENOR—COMMISSIONER, INDIANA DEPARTMENT OF INSURANCE AS ADMINISTRATOR OF THE INDIANA PATIENT'S COMPENSATION FUND

Matthew W. Conner
Wade D. Fulford
Michael D. Heavilon
Lewis Wagner, LLP
Indianapolis, Indiana

ATTORNEYS FOR INTERVENOR-PLAINTIFFS

Kenneth J. Allen
Robert D. Brown
Sarah M. Cafiero
Jack A. Kramer
Allen Law Group
Valparaiso, Indiana

Peter D. Hamann
Ryan G. Milligan
Daniel H. Pfeifer
Jeffrey J. Stesiak
Pfeifer Morgan & Stesiak
South Bend, Indiana

David M. McTigue
Herendeen Kowals & McTigue
South Bend, Indiana

ATTORNEYS FOR AMICUS CURIAE—INDIANA HOSPITAL ASSOCIATION

Angela M. Smith
Matthew M. Schappa
John D. French
Hall Render Killian Heath & Lyman
Indianapolis, Indiana

ATTORNEYS FOR AMICUS CURIAE—DEFENSE TRIAL COUNSEL
OF INDIANA
Jenny R. Buchheit
Abby V. DeMare
Sean T. Dewey
Ice Miller LLP
Indianapolis, Indiana


Lucy R. Dollens
Quarles & Brady
Indianapolis, Indiana

**Slaughter, J., concurring in judgment in part, dissenting in part.**

The Court holds that the medical malpractice act applies to claims for emotional distress. Unlike the Court, I would hold that the act does not apply because the plaintiffs are not alleging "bodily injury or death". I ground my conclusion in the act's plain meaning, which prevails over rival considerations like legislative history and statutory purpose. Any supposedly contrary Indiana precedent has not decided this issue of first impression. And our common-law impact rule does not mean the plaintiffs' claims allege "bodily injury" under the act. Because I conclude the act does not apply, I agree that the trial court had jurisdiction to decide the class-worthiness of the plaintiff's claims under Trial Rule 23. Thus, I concur in the Court's judgment in part and write separately to explain why I respectfully dissent from its holding that the act applies here.

A

The plain meaning of Indiana Code section 34-18-8-1 authorizes a patient with a claim for "bodily injury or death on account of malpractice" to file a complaint for relief under the medical malpractice act. Ind. Code § 34-18-8-1. The act does not authorize a complaint alleging any other claims, including those for emotional distress.

1

The Court interprets the act to cover **all** claims for "malpractice" by a "patient" against a "health care provider", as those terms are defined in the act, *ante*, at 5–10, and not just claims for "bodily injury or death". But this interpretation runs into an unassailable fact. The key statutory provision allowing an aggrieved patient to seek judicial relief at all—the so-called "complaint" statute—limits the complaints authorized under the act to those asserting claims "for bodily injury or death on account of malpractice":

> Subject to IC 34-18-10 and sections 4 through 6 of this chapter [IC 34-18-8], a patient or the representative of a patient who has a claim under this article **for bodily injury or death on account of malpractice** may do the following:

(1) File a complaint in any court of law having requisite jurisdiction.

(2) By demand, exercise the right to a trial by jury.

*Id*. § 34-18-8-1 (emphasis added). The phrase "for bodily injury or death on account of malpractice" is clear and unambiguous. Though the act does not define "bodily injury", the Court itself notes that general-language dictionaries define "bodily" as "physical" or "corporeal" and not "mental or spiritual". *Ante*, at 7–8 (citation omitted).

The plaintiffs here have not alleged bodily injury (or death)—only emotional distress. Their limited allegation means their claims are not subject to the act. Under our Court's precedent, the complaint statute defines the claims subject to the act; only those claims described in the statute fall within the act's scope. See, e.g., *Cutchin v. Beard*, 171 N.E.3d 991, 995 (Ind. 2021). In *Cutchin*, we observed that this statute defines "both what kind of claim and what kind of claimant are subject to the Act." *Ibid.* Our holding in *Cutchin* confirms that only those claims described in section 34-18-8-1 are subject to the act. Because the plaintiffs here have not alleged bodily injury (or death), as this section requires, their claims fall outside the act.

The Court acknowledges the plain-meaning of "bodily injury" yet holds the plaintiffs' claims are subject to the act. *Ante*, at 12. In doing so, the Court allows that the term "bodily injury" may be ambiguous. *Id.* at 10 n.3. In that case, the Court says, "we may resort to settled canons of statutory construction, [the] application of which would lead us to the same conclusion"—namely, that the act is not limited to claims for bodily injury (or death). *Ibid.* (citation omitted). Yet if "bodily injury" were indeed ambiguous, our interpretive canons would require us to err on the side of **excluding** other claims from the act, not the other way around. *Cmty. Health Network, Inc. v. McKenzie*, 185 N.E.3d 368, 375 (Ind. 2022). The act, after all, "is in derogation of the common law", which means it "should be strictly construed against imposing limitations on a claimant's right to bring suit." *Ibid*. In other words, claims not clearly subject to the act must be excluded from its coverage, not included.

To be clear, the complaint statute's "bodily injury or death" requirement does not affect common-law negligence claims for medical malpractice. Malpractice claims that fall outside the act are still legally cognizable in Indiana as common-law tort claims. Our Court has long held that the act "simply requires that 'claims for medical malpractice that are otherwise recognized under tort law and applicable statutes be pursued through the procedures of the MMA.'" *Spangler v. Bechtel*, 958 N.E.2d 458, 469–70 (Ind. 2011) (quoting *Chamberlain v. Walpole*, 822 N.E.2d 959, 963 (Ind. 2005)). The act "is not all-inclusive for claims against healthcare providers, nor is it intended to be extended to cases of ordinary negligence." *Rossner v. Take Care Health Sys., LLC*, 172 N.E.3d 1248, 1254 (Ind. Ct. App. 2021). Thus, as the Court notes, claims for "anxiety and distress of mind", *ante*, at 13 n.6, which include the plaintiffs' claims here for emotional distress, remain viable. The only difference is that because such claims are not subject to the act, a plaintiff asserting them faces none of the act's benefits or burdens.

2

Where the Court goes wrong, in my view, is in presuming the complaint statute does not mean what it says.

To get around the statute's plain meaning, the Court tries to minimize its scope. The Court notes that the statute's limited authorization for seeking judicial relief is "[s]ubject to" a few qualifications, and some exceptions to qualifications. *Ante*, at 8–10 (discussing I.C. § 34-18-8-1). But, contrary to the Court's view, these qualifications (and exceptions) do not negate the "bodily injury or death" requirement; they merely address whether and when an aggrieved patient must first present her complaint for relief to a medical review panel. Under the statute, the patient may sue in court only after receiving an opinion from a medical review panel, see generally I.C. ch. 34-18-10; *id.* § 34-18-8-4, unless all parties agree to bypass the panel, *id.* § 34-18-8-5, or the claim is worth less than $15,000, *id.* § 34-18-8-6. Thus, we cannot dismiss the "bodily injury or death" requirement as contrary to the rest of the act.

The Court next points to certain defined terms in the act purportedly to show that it applies to other claims than bodily injury or death. *Ante*, at 9–10. The Court's recited definitions are correct. But these terms do not erase section 34-18-8-1's plain meaning. And they do nothing to expand the statute beyond claims for bodily injury or death. For example, the Court is right that a patient includes a person with a derivative claim under the act. *Ante*, at 10. But a derivative claim still cannot proceed without a primary claim meeting the act's requirements. A derivative claim is subject to the act only if the primary claim is, too. Thus, a third-party claimant does not herself need a physician-patient relationship or the requisite bodily injury, but the underlying claimant does require such a relationship and injury. *Cutchin*, 171 N.E.3d at 995. As another example, the Court observes that the act defines health care provider to include psychiatric facilities and the like. *Ante*, at 9. "Of course," the Court muses, "these entities could cause bodily injury by, for example, administering the wrong type of medication." *Id.* at 9 n.2. This is exactly right. These definitions in the act are consistent with claims for bodily injury or death, not at odds with them.

The Court also cites section 34-18-8-7 as supposed proof the act imposes "**no** 'bodily injury' requirement at all." *Id.* at 11–12 (emphasis in original). But that is not what this section says or does. This section permits a plaintiff to "commence an action in court for malpractice"—the very same "action" that section 34-18-8-1 authorizes with its "bodily injury or death" requirement—while the medical review panel considers the plaintiff's proposed complaint under the act. I.C. § 34-18-8-7. Thus, section 7 merely recites what can happen in court before the medical review panel renders its decision, not what claims are subject to the act.

For her part, the state insurance commissioner, who administers the patient compensation fund and sought today's result, concedes the statute's plain meaning and deserves credit for her candor. Her briefing on this issue does not ignore "bodily injury or death" or pretend the phrase means something it does not. She describes the complaint statute's inclusion of this phrase as "inartful surplusage" and urges us to interpret the statute as if these key words were omitted: "Subject to IC 34-18-10 and

sections 4 through 6 of this chapter, a patient who has a claim under this article for ~~bodily injury or death on account of~~ malpractice may do the following . . .".

There is no doubt a statute written as the commissioner recasts it would support her position (and the Court's conclusion) unambiguously. The problem is that this is not the statute the legislature wrote. "Under our surplusage canon, courts should give effect to every word and eschew those interpretations that treat some words as duplicative or meaningless." *Cutchin*, 171 N.E.3d at 997 (cleaned up). The best way to interpret this (and any) statute is to give effect to all its terms.

Rather than rewrite the complaint statute, we should interpret it as written. This statute authorizes claims under the act "for bodily injury or death" due to malpractice by a healthcare provider. Given this restriction, the plaintiffs' emotional-distress claims are not subject to the act.

B

Despite the statute's plain meaning, the Court relies on purposivism and what it calls "decades" of precedent for its contrary conclusion. Neither should prevail over the act's plain meaning.

1

As the Court sees things, statutory purpose as informed by legislative history tells us more about a statute's meaning than does its text. The Court cites several authorities for its conclusion that the medical malpractice act covers "all" malpractice claims and not just those for "bodily injury or death". Among the authorities the Court cites are a 1984 article by former governor Otis R. Bowen, M.D., who signed the act into law nine years earlier; a 1976 report from a legislative study commission on medical malpractice; and a 1973 federal report on medical malpractice from the U.S. Department of Health, Education, and Welfare. See *ante*, at 16–18. These authorities, we are to believe, reveal the act's meaning more clearly than does the act itself: "Conspicuously absent from the MMA's legislative history", the Court says, "is any expression of the legislature's intent for the Act to cover only certain malpractice claims or to exclude

certain healthcare providers." *Id.* at 17. In other words, we must ignore what the legislature enacted in section 34-18-8-1 because other, non-authoritative sources do not say the same thing.

The Court's formulation has things backward. Legislative history does not negate a statute's meaning by ignoring its text. What a statute means comes from its text—not from conjecture about what the legislature meant or intended: "What counts as law, after all, is a statute's enacted text—text forged by the dual constitutional requirements of bicameralism and presentment—and not what we wish or suppose the legislature intended to enact." *State v. Neukam*, 189 N.E.3d 152, 155 (Ind. 2022). Ignoring a statute's plain text based on extratextual sources "would risk amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 535 (2019) (cleaned up). Stated differently, "[t]he Court may not replace the actual text with speculation as to [legislative] intent." *Oklahoma v. Castro-Huerta*, 142 S. Ct. 2486, 2496 (2022) (internal quotations omitted).

Yet the Court does exactly that; it replaces the complaint statute's plain text with speculation as to legislative intent. The Court says it is eschewing a "strict textualist approach" to relieve our legislature from the "unnecessary burden" of anticipating the "virtually limitless range of implications" that follow from its word choice. *Ante*, at 12–13. I cannot disagree more with the Court's approach, which blurs the line between judging and lawmaking. It urges interpretation based on the legislature's "purpose" given "the realities of the legislative process" and "the limited time and resources with which our legislators work." *Ante*, at 13 n.5. But this approach cannot be squared with our constitution's separation-of-powers provision, which bars officials in one government department from "exercis[ing] any of the functions of another, except as in this Constitution expressly provided." Ind. Const. art. 3, § 1. Our Constitution vests lawmaking power in the legislature, not the judiciary. The courts' role is to interpret what the legislature wrote, not to rewrite its handiwork to match what we wish or suppose to be its "purpose".

One consequence of the Court's approach is that the public cannot count on the law's text to discern its meaning. We charge the public with knowing the law and following it on pain of legal consequence for noncompliance. Due process thus demands "that the law [be] accessible." *Bellwether Props., LLC v. Duke Energy Ind., Inc.*, 87 N.E.3d 462, 467 (Ind. 2017). Meaningful access depends on the enacted text, not speculation over what legislators intended to enact. Yet when enacted text yields to legislative purpose, the public cannot know what a statute means, at least until the Court pronounces its meaning. Access to the law's demands is for everyone, not just mind readers.

2

The other reason the Court says it is applying the act here is "decades" of supposedly contrary Indiana precedent. *Ante*, at 12–15. The Court points to Indiana appellate precedent that **assumed** the act applies to other claims than those for bodily injury or death. See *ibid.* (citing and discussing cases). But other appellate cases assumed the opposite. For example, in *Peters v. Cummins Mental Health, Inc.*, the court of appeals stated the act did not apply to a plaintiff's claim for intentional infliction of emotional distress because she "made no claim for bodily injury or death on account of malpractice, so as to bring her claims within the purview of the Act." 790 N.E.2d 572, 576 (Ind. Ct. App. 2003).

*Peters* aside, two cases from our Court have also assumed the act applies only to claims for bodily injury or death. *Ind. Patient's Comp. Fund v. Patrick*, 929 N.E.2d 190 (Ind. 2010); *Lake Imaging, LLC v. Franciscan All., Inc.*, 182 N.E.3d 203 (Ind. 2022). One of these cases, *Lake Imaging*, 182 N.E.3d 203, is from just three years ago. There, I joined our unanimous opinion holding that a claim for indemnification by one medical provider against another is not subject to the act. In deciding that issue, we observed that section 34-18-8-1 means the act "is intended to cover only claims for bodily injury or death". *Id*. at 208. In my view, the Court was right then and wrong now, and our observation then was hardly earth-shattering.

And in our 2010 *Patrick* case, 929 N.E.2d at 190, we applied the "bodily injury" requirement to a father's derivative malpractice claim for emotional distress after the son's death. In holding that only the actual victim of malpractice need suffer bodily injury or death, we made the following observation in terms reminiscent of our decision in *Lake Imaging*: "The MMA does not define 'bodily injury,' but we have held that the requirement for bodily injury (or death) applies to the actual victim of the malpractice and not to derivative claimants." *Id*. at 192. Doubling down on the same point, we held that "[t]he MMA does not contain a requirement for bodily injury for derivative claimants", *ibid*., thus leaving the unmistakable impression that "bodily injury (or death)" **is** a "requirement" under the act for direct claimants, i.e., the "actual victim[s] of the malpractice". *Ibid*.

These statements from our precedent, even if they are dicta and not specific holdings, are in tension with what we hold today—that "bodily injury or death" is **not** a requirement under the act even for patient claims. Thus, if today's opinion upends anything, it is our own prior suggestions that the act applies only to claims for bodily injury or death. My point is not to establish that our contrary precedent was correct (though I think it was correct), but to show that the Court's concern that we would upend precedent by following the statute's plain meaning rings hollow.

And I have found no such precedent to upend. For its part, the Court insists that *Spangler* supports its conclusion that "[c]laims for 'negligent infliction of emotional distress, if arising from alleged medical malpractice, are subject to the MMA . . . because they are **'otherwise' a result of alleged malpractice**." *Ante*, at 15 (quoting *Spangler*, 958 N.E.2d at 472) (emphasis in original). True enough, but *Spangler* was about who is a "patient" under the act, not whether the complaint's statute's "bodily injury or death" requirement restricts the act's application. 958 N.E.2d at 472. *Spangler* simply has nothing to say on the question before us because the plaintiffs there did "not dispute that their action against the hospital is governed by the MMA." *Ibid*.

At bottom, the Court cites no case that has decided this precise question: whether a claim's failure to allege "bodily injury or death" is fatal to the act's application. Given the unprecedented nature of the dispute before us, it is a stretch for the Court to say that finding the act inapplicable here "would upend decades of Indiana precedent." *Ante*, at 15. Deciding an issue for the first time upends nothing.

C

Finally, having said that the act does not require "bodily injury or death", the Court then holds that the plaintiffs sufficiently allege "bodily injury" after all. *Id.* at 19–21. The Court reaches this conclusion by engrafting our defunct, common-law "impact rule" onto the act's complaint statute, treating "bodily injury" under the act and physical injury under the impact rule as one and the same.

The Court's "graftsmanship"—conflating two distinct doctrines to reach a result neither would support on its own—amounts to judicial ju-jitsu. The act's bodily-injury requirement and our bygone impact rule have nothing to do with each other, except that both involve physical touching. And for claims alleging negligent infliction of emotional distress, our Court abandoned the original impact rule over thirty years ago. *Shuamber v. Henderson*, 579 N.E.2d 452, 456 (Ind. 1991). If the legislature had intended our former impact rule to serve as the act's baseline for bodily injury, it would have said so plainly. But it did not. The legislature said only that those claims alleging "bodily injury or death" fall under the act. I.C. § 34-18-8-1. In light of the legislature's decision, we should not try to force the square peg of our obsolete impact rule into the round hole of the medical malpractice act.

\*       \*       \*

Perhaps the Court is ultimately right about legislative purpose. Maybe the legislature really did want the act to apply to "all" patient claims for medical malpractice, and not just those for "bodily injury or death". But courts interpreting and applying the act are right to demand that the legislature say what it means and make its purpose (whatever it is) unmistakably clear. Until or unless the legislature amends the complaint statute to excise any reference to "bodily injury or death", I would

continue to interpret the statute as written and in line with our Court's statements in *Lake Imaging* and *Patrick*.

For these reasons, I concur in the Court's judgment in part and dissent in part.


Molter, J., joins.